# BERNAL v. FAINTER, SECRETARY OF STATE OF TEXAS, ET AL.

No. 83-630.  Argued March 28, 1984—Decided May 30, 1984

*Cornish F. Hitchcock* argued the cause for petitioner. With him on the brief were *Alan B. Morrison, John Cary Sims, Thomas Sullivan,* and *Denis A. Downey.*

*Mary F. Keller,* Assistant Attorney General of Texas, argued the cause for respondents. With her on the brief were *Jim Mattox,* Attorney General, *Fernando Gomez,* Assistant Attorney General, and *David R. Richards.*

JUSTICE MARSHALL delivered the opinion of the Court.

The question posed by this case is whether a statute of the State of Texas violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution by denying aliens the opportunity to become notaries public. The Court of Appeals for the Fifth Circuit held that the stat-

ute does not offend the Equal Protection Clause. We granted certiorari, 464 U. S. 1007 (1983), and now reverse.

## I

Petitioner, a native of Mexico, is a resident alien who has lived in the United States since 1961. He works as a paralegal for Texas Rural Legal Aid, Inc., helping migrant farmworkers on employment and civil rights matters. In order to administer oaths to these workers and to notarize their statements for use in civil litigation, petitioner applied in 1978 to become a notary public.[1] Under Texas law, notaries public authenticate written instruments, administer oaths, and take out-of-court depositions.[2] The Texas Secretary of State denied petitioner's application because he failed to satisfy the statutory requirement that a notary public be a citizen of the United States. Tex. Rev. Civ. Stat. Ann., Art. 5949(2) (Vernon Supp. 1984) (hereafter Article 5949(2)). After an unsuccessful administrative appeal, petitioner brought suit in the Federal District Court, claiming that the citizenship requirement mandated by Article 5942(2) violated the Federal Constitution.[3]

The District Court ruled in favor of petitioner. *Vargas* v. *Strake*, C. A. No. B-79-147 (SD Tex., Oct. 9, 1981) (mem.). It reviewed the State's citizenship requirement under a

[1] Prior to his employment in Texas, petitioner worked in a legal services program in Indiana and held a commission as a notary in that State. *Vargas* v. *Strake*, 710 F. 2d 190, 191 (CA5 1983).

[2] "Notaries Public shall have the same authority to take acknowledgments or proofs of written instruments, protest instruments permitted by law to be protested, administer oaths, and take depositions, as is now or may hereafter be conferred by law upon County Clerks . . . ." Tex. Rev. Civ. Stat. Ann., Art. 5954 (Vernon Supp. 1984); see also R. Rothman, Notary Public: Practices & Glossary (1978).

[3] This suit was initially brought by Margarita M. Vargas whom petitioner joined as a coplaintiff. Vargas is no longer a party to this suit because subsequent to filing her complaint she obtained United States citizenship. *Vargas* v. *Strake, supra,* at 192.

strict-scrutiny standard and concluded that the requirement violated the Equal Protection Clause. The District Court also suggested that even under a rational-relationship standard, the state statute would fail to pass constitutional muster because its citizenship requirement "is wholly unrelated to the achievement of any valid state interest." App. to Pet. for Cert. 11a. A divided panel of the Court of Appeals for the Fifth Circuit reversed, concluding that the proper standard for review was the rational-relationship test and that Article 5949(2) satisfied that test because it "bears a rational relationship to the state's interest in the proper and orderly handling of a countless variety of legal documents of importance to the state." *Vargas* v. *Strake*, 710 F. 2d 190, 195 (1983).[4]

## II

As a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny.[5] In order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available.[6] Applying this principle,

---

[4] The holding of the Court of Appeals conflicts with the holding of every other state and federal court decision that has considered the constitutionality of statutes barring aliens from eligibility to become notaries public. See, *e. g.*, *Jii* v. *Rhodes*, 577 F. Supp. 1128 (SD Ohio 1983) (invalidating Ohio statute); *Cheng* v. *Illinois*, 438 F. Supp. 917 (ND Ill. 1977) (invalidating Illinois statute); *Taggart* v. *Mandel*, 391 F. Supp. 733 (Md. 1975) (invalidating Maryland statute) (three-judge court); *Graham* v. *Ramani*, 383 So. 2d 634 (Fla. 1980) (invalidating Florida statute).

[5] "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." *Graham* v. *Richardson*, 403 U. S. 365, 372 (1971) (footnotes and citations omitted).

[6] Only rarely are statutes sustained in the face of strict scrutiny. As one commentator observed, strict-scrutiny review is "strict" in theory but usually "fatal" in fact. Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972).

we have invalidated an array of state statutes that denied aliens the right to pursue various occupations. In *Sugarman* v. *Dougall*, 413 U. S. 634 (1973), we struck down a state statute barring aliens from employment in permanent positions in the competitive class of the state civil service. In *In re Griffiths*, 413 U. S. 717 (1973), we nullified a state law excluding aliens from eligibility for membership in the State Bar. And in *Examining Board* v. *Flores de Otero*, 426 U. S. 572 (1976), we voided a state law that excluded aliens from the practice of civil engineering.

We have, however, developed a narrow exception to the rule that discrimination based on alienage triggers strict scrutiny. This exception has been labeled the "political function" exception and applies to laws that exclude aliens from positions intimately related to the process of democratic self-government. The contours of the "political function" exception are outlined by our prior decisions. In *Foley* v. *Connelie*, 435 U. S. 291 (1978), we held that a State may require police to be citizens because, in performing a fundamental obligation of government, police "are clothed with authority to exercise an almost infinite variety of discretionary powers" often involving the most sensitive areas of daily life. *Id.*, at 297. In *Ambach* v. *Norwick*, 441 U. S. 68 (1979), we held that a State may bar aliens who have not declared their intent to become citizens from teaching in the public schools because teachers, like police, possess a high degree of responsibility and discretion in the fulfillment of a basic governmental obligation. They have direct, day-to-day contact with students, exercise unsupervised discretion over them, act as role models, and influence their students about the government and the political process. *Id.*, at 78–79. Finally, in *Cabell* v. *Chavez-Salido*, 454 U. S. 432 (1982), we held that a State may bar aliens from positions as probation officers because they, like police and teachers, routinely exercise discretionary power, involving a basic governmental function, that places them in a position of direct authority over other individuals.

The rationale behind the political-function exception is that within broad boundaries a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community. Some public positions are so closely bound up with the formulation and implementation of self-government that the State is permitted to exclude from those positions persons outside the political community, hence persons who have not become part of the process of democratic self-determination.

"The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community." *Id.*, at 439–440.

We have therefore lowered our standard of review when evaluating the validity of exclusions that entrust only to citizens important elective and nonelective positions whose operations "go to the heart of representative government." *Sugarman* v. *Dougall, supra,* at 647. "While not retreating from the position that restrictions on lawfully resident aliens that primarily affect economic interests are subject to heightened judicial scrutiny . . . we have concluded that strict scrutiny is out of place when the restriction primarily serves a political function. . . ." *Cabell* v. *Chavez-Salido, supra,* at 439 (citation omitted).

To determine whether a restriction based on alienage fits within the narrow political-function exception, we devised in *Cabell* a two-part test.

"First, the specificity of the classification will be examined: a classification that is substantially overinclusive or underinclusive tends to undercut the governmental claim that the classification serves legitimate political ends. . . . Second, even if the classification is sufficiently

tailored, it may be applied in the particular case only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions,' those officers who 'participate directly in the formulation, execution, or review of broad public policy' and hence 'perform functions that go to the heart of representative government.'" 454 U. S., at 440 (quoting *Sugarman* v. *Dougall, supra,* at 647).[7]

### III

We now turn to Article 5949(2) to determine whether it satisfies the *Cabell* test. The statute provides that "[t]o be eligible for appointment as a Notary Public, a person shall be a resident citizen of the United States and of this state . . ." Unlike the statute invalidated in *Sugarman,* Article 5949(2) does not indiscriminately sweep within its ambit a wide range of offices and occupations but specifies only one particular post with respect to which the State asserts a right to exclude aliens. Clearly, then, the statute is not overinclusive; it applies narrowly to only one category of persons: those wishing to obtain appointments as notaries. Less clear is whether Article 5949(2) is fatally underinclusive. Texas does not require court reporters to be United States citizens even though they perform some of the same services as notaries.[8] Nor does Texas require that its Secretary of State be a citizen,[9] even though he holds the highest appointive posi-

---

[7] We emphasize, as we have in the past, that the political-function exception must be narrowly construed; otherwise the exception will swallow the rule and depreciate the significance that should attach to the designation of a group as a "discrete and insular" minority for whom heightened judicial solicitude is appropriate. See *Nyquist* v. *Mauclet,* 432 U. S. 1, 11 (1977).

[8] Like notaries public, court reporters are authorized to administer oaths and take depositions. Tex. Rev. Civ. Stat. Ann., Art. 2324a(1) (Vernon 1971).

[9] Texas appears to require only that the Secretary of State be appointed by the Governor with the advice and consent of the Senate. See Tex. Const., Art. IV, § 21. Respondents, moreover, implicitly concede that the State imposes no citizenship requirement upon the position of Secretary of

tion in the State and performs many important functions, including supervision of the licensing of all notaries public.[10] We need not decide this issue, however, because of our decision with respect to the second prong of the *Cabell* test.

In support of the proposition that notaries public fall within that category of officials who perform functions that "go to the heart of representative government," the State emphasizes that notaries are designated as public officers by the Texas Constitution.[11] Texas maintains that this designation indicates that the State views notaries as important officials occupying posts central to the State's definition of itself as a political community. This Court, however, has never deemed the *source* of a position—whether it derives from a State's statute or its Constitution—as the dispositive factor in determining whether a State may entrust the position only to citizens. Rather, this Court has always looked to the actual *function* of the position as the dispositive factor.[12] The

---

State. See Brief for Respondents 21–24 (distinguishing notaries public and other officers subject to a citizenship requirement from Secretary of State).

[10] See Tex. Rev. Civ. Stat. Ann., Art. 5949(3) (Vernon Supp. 1984).

[11] The Texas Constitution provides that "[t]he Secretary of State shall appoint a convenient number of Notaries Public for the state. . . ." Art. IV, § 26. Texas is one of only six States in which the State Constitution provides for the appointment of notaries. 1 G. Braden et al., The Constitution of the State of Texas: An Annotated and Comparative Analysis 361–362 (1977) (hereinafter Braden).

[12] We note, moreover, that although authorization for the appointment of notaries public has long been a feature of the Texas Constitution, the significance of the position has necessarily been diluted by changes in the appointment process and by the wholesale proliferation of notaries. The Texas Constitution of 1845 authorized the appointment of only six notaries per county and directed that they be appointed by the Governor with the advice and consent of the State Senate. Braden 361. By contrast, the Texas Constitution now authorizes the Secretary of State to appoint a "convenient" number of notaries for each county. Art. IV, § 26; see also Braden 361–362. Counsel for respondents conceded at oral argument that the number of Texas notaries exceeds 100,000. Tr. of Oral Arg. 17 ("I believe, reading Petitioner's brief, that there are in excess of 100,000. Maybe there are 300,000 notaries").

focus of our inquiry has been whether a position was such that the officeholder would necessarily exercise broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population—power of the sort that a self-governing community could properly entrust only to full-fledged members of that community. As the Court noted in *Cabell*, in determining whether the function of a particular position brings the position within the narrow ambit of the exception, "the Court will look to the importance of the function as a factor giving substance to the concept of democratic self-government." 454 U. S., at 441, n. 7.

The State maintains that even if the actual function of a post is the touchstone of a proper analysis, Texas notaries public should still be classified among those positions from which aliens can properly be excluded because the duties of Texas notaries entail the performance of functions sufficiently consequential to be deemed "political." [13] The Court of Appeals ably articulated this argument:

> "With the power to acknowledge instruments such as wills and deeds and leases and mortgages; to take out-of-court depositions; to administer oaths; and the discretion to refuse to perform any of the foregoing acts, notaries public in Texas are involved in countless matters of importance to the day-to-day functioning of state government. The Texas political community depends upon the notary public to insure that those persons executing documents are accurately identified, to refuse to certify any identification that is false or uncertain, and to insist that

---

[13] "Notaries Public shall have the same authority to take acknowledgments or proofs of written instruments, protest instruments permitted by law to be protested, administer oaths, and take depositions, as is now or may hereafter be conferred by law upon County Clerks. . . ." Tex. Rev. Civ. Stat. Ann., Art. 5954 (Vernon Supp. 1984). County clerks are authorized to record and acknowledge a wide range of documents. Art. 6591 (Vernon 1969) ("County clerks shall be the recorders for their respective counties").

oaths are properly and accurately administered. Land titles and property succession depend upon the care and integrity of the notary public, as well as the familiarity of the notary with the community, to verify the authenticity of the execution of the documents." 710 F. 2d, at 194.

We recognize the critical need for a notary's duties to be carried out correctly and with integrity. But a notary's duties, important as they are, hardly implicate responsibilities that go to the heart of representative government. Rather, these duties are essentially clerical and ministerial. In contrast to state troopers, *Foley* v. *Connelie,* 435 U. S. 291 (1978), notaries do not routinely exercise the State's monopoly of legitimate coercive force.[14] Nor do notaries routinely exercise the wide discretion typically enjoyed by public school teachers when they present materials that educate youth respecting the information and values necessary for the maintenance of a democratic political system. See *Ambach* v. *Norwick,* 441 U. S., at 77. To be sure, considerable damage could result from the negligent or dishonest performance of a notary's duties. But the same could be said for the duties

---

[14] At oral argument, counsel for respondents observed in passing that Texas authorizes notaries to subpoena witnesses for the purpose of obtaining testimony regarding the authenticity of a document, Tex. Rev. Civ. Stat. Ann., Art. 6616 (Vernon 1969), and also authorizes notaries to enforce this authority with civil contempt powers. Art. 6618. We do not consider the notary's apparent power to hold persons in contempt at all analogous to the coercive power routinely exercised by policemen, judges, or other officers charged with the administration of justice. One indication that this power is merely formal with no relevance to day-to-day experience is that it seems to have figured in only two reported cases, the most recent of which was decided over 40 years ago in 1942. See *Ex parte Wolf,* 116 Tex. Crim. 127, 34 S. W. 2d 277 (1930); *Harbison* v. *McMurray,* 138 Tex. 192, 158 S. W. 2d 284 (1942). That it was not even mentioned in respondents' brief is a further indication that this power is moribund. Cf. *Jii* v. *Rhodes,* 577 F. Supp., at 1131 (political-function exception not applicable to notary public notwithstanding notary's statutory authorization to hold recalcitrant witness in contempt).

performed by cashiers, building inspectors, the janitors who clean up the offices of public officials, and numerous other categories of personnel upon whom we depend for careful, honest service. What distinguishes such personnel from those to whom the political-function exception is properly applied is that the latter are invested either with policymaking responsibility or broad discretion in the execution of public policy that requires the routine exercise of authority over individuals. Neither of these characteristics pertains to the functions performed by Texas notaries.

The inappropriateness of applying the political-function exception to Texas notaries is further underlined by our decision in *In re Griffiths*, 413 U. S. 634 (1973), in which we subjected to strict scrutiny a Connecticut statute that prohibited noncitizens from becoming members of the State Bar. Along with the usual powers and privileges accorded to members of the bar, Connecticut gave to members of its Bar additional authority that encompasses the very duties performed by Texas notaries—authority to "'sign writs and subpoenas, take recognizances, administer oaths and take depositions and acknowledgements of deeds.'" *Id.*, at 723 (quoting Connecticut statute).[15] In striking down Connecticut's citizenship requirement, we concluded that "[i]t in no way denigrates a lawyer's high responsibilities to observe that [these duties] hardly involve matters of state policy or acts of such unique responsibility as to entrust them only to citizens." *Id.*, at 724. If it is improper to apply the political-function exception to a citizenship requirement governing eligibility for membership in a state bar, it would be anomalous to apply the exception to the citizenship requirement that governs eligibility to become a Texas notary. We conclude, then, that

---

[15] In Connecticut, members of the Bar were empowered to function both as attorneys and as commissioners of the Superior Court. The former position entailed lawyer's work; the latter, work that is often performed by notaries public. See *In Re Griffiths*, 413 U. S., at 723–725.

the "political function" exception is inapplicable to Article 5949(2) and that the statute is therefore subject to strict judicial scrutiny.

## IV

To satisfy strict scrutiny, the State must show that Article 5949(2) furthers a compelling state interest by the least restrictive means practically available. Respondents maintain that Article 5949(2) serves its "legitimate concern that notaries be reasonably familiar with state law and institutions" and "that notaries may be called upon years later to testify to acts they have performed." Brief for Respondents 24–25. However, both of these asserted justifications utterly fail to meet the stringent requirements of strict scrutiny. There is nothing in the record that indicates that resident aliens, as a class, are so incapable of familiarizing themselves with Texas law as to justify the State's absolute and classwide exclusion. The possibility that some resident aliens are unsuitable for the position cannot justify a wholesale ban against all resident aliens. Furthermore, if the State's concern with ensuring a notary's familiarity with state law were truly "compelling," one would expect the State to give some sort of test actually measuring a person's familiarity with the law. The State, however, administers no such test. To become a notary public in Texas, one is merely required to fill out an application that lists one's name and address and that answers four questions pertaining to one's age, citizenship, residency, and criminal record[16]—nothing that reflects the State's asserted interest in ensuring that notaries are familiar with Texas law. Similarly inadequate is the State's purported interest in ensuring the later availability of notaries' testimony. This justification fails because the State fails to advance a factual showing that the unavailability of notaries' testimony presents a real, as opposed to a merely specula-

---

[16] See Tex. Rev. Civ. Stat. Ann., Art. 5949(3)(a) (Vernon Supp. 1984).

tive, problem to the State. Without a factual underpinning, the State's asserted interest lacks the weight we have required of interests properly denominated as compelling.[17]

## V

We conclude that Article 5949(2) violates the Fourteenth Amendment of the United States Constitution. Accordingly the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, dissenting.

I dissent for the reasons stated in my dissenting opinion in *Sugarman* v. *Dougall*, 413 U. S. 634, 649 (1973).

---

[17] The State did not even attempt to defend the statute against strict scrutiny, perhaps recognizing that such a defense would be futile. Rather, the State simply asserted that the statute could withstand the lesser scrutiny of rationality review. See Brief for Respondents 24.