[No. S023805. Nov. 9, 1992.]

BOARD OF SUPERVISORS OF SACRAMENTO COUNTY et al., Plaintiffs and Appellants, v.
LOCAL AGENCY FORMATION COMMISSION OF SACRAMENTO COUNTY, Defendant and Appellant;
CITRUS HEIGHTS INCORPORATION PROJECT, Real Party in Interest and Appellant.

904

## COUNSEL

Brenton A. Bleier, Peter Mixon, Remy & Thomas, Tina A. Thomas, James G. Moose and Whitman Manley for Plaintiffs and Appellants.

Dwight L. Herr, County Counsel (Santa Cruz), Deborah Steen and Jane M. Scott, Assistant County Counsel, and Victor J. Westman, County Counsel (Contra Costa), as Amici Curiae on behalf of Plaintiffs and Appellants.

Hyde & Miller, Hyde, Miller & Owen, Hyde, Miller & Savage, Nancy C. Miller, Kirk E. Trost, Matina R. Kolokotronis, Christiane E. Layton and Paul Chrisman for Defendant and Appellant.

Downey, Brand, Seymour & Rohwer and Patrick J. Borchers for Real Party in Interest and Appellant.

Rourke & Woodruff, Rourke, Woodruff & Spradlin, Daniel K. Spradlin, Lois E. Jeffrey, Robert W. Lucas, Kronick, Moskovitz, Tiedemann & Girard and Anthony B. Manzanetti as Amici Curiae on behalf of Defendant and Appellant and Real Party in Interest and Appellant.

## OPINION

**MOSK, J.**—Residents of an unincorporated area of Sacramento County seek to incorporate into a city. Government Code section 57103 provides that

only the voters residing in the territory to be incorporated may vote to confirm the incorporation. The Court of Appeal found this law unconstitutional as applied, holding that it violates the guaranty of equal protection of the laws. We conclude that the law is constitutional, both on its face and as applied to the incorporation at issue.

The case before us illustrates the tension between California's financially beleaguered counties and the desire of residents of unincorporated areas to form cities and draw local government closer to home.[1] With the fall in tax rates following the adoption of Proposition 13 (Cal. Const., art. XIII A) in 1978, and a concomitant population-driven rise in demand for services, this tension has grown in recent years: at least one California county has considered bankruptcy and, like the state itself, all counties have had to make painful spending decisions. The counties fear that if tax-rich districts form cities, the counties will be deprived of revenue and their financial position further weakened. (See *Arrival of New Cities Puts Counties on a Starvation Diet*, L.A. Times (Orange Co. ed., Feb. 17, 1991) Metro sec., pt. B, p. 8, col. 1.) On the other hand, community residents and landowners often prefer to govern their local affairs insofar as possible, and cityhood provides them with greater opportunities for self-determination than does residence or ownership in a more amorphous unincorporated area. The evolution of cities is a natural process when population grows and communities begin to form their own identities.

Acknowledging the tension between fiscal concerns and the desire for self-government, the Legislature enacted the Cortese-Knox Local Government Reorganization Act of 1985.[2] The Cortese-Knox Act consolidated three major laws governing local government boundary changes. As explained in *Fallbrook Sanitary Dist. v. San Diego Local Agency Formation Com.* (1989) 208 Cal.App.3d 753, 758 [256 Cal.Rptr. 590], "In 1985, the Legislature repealed the Knox-Nisbet Act (former § 54773 et seq.), the District Reorganization Act of 1965 (former § 56000 et seq.) and the Municipal Organization Act of 1977 (former § 35000 et seq.), and replaced these laws with the Cortese-Knox Act . . . ." The new scheme's provisions became operative January 1, 1986. (*Ibid.*)

In 1986 persons in the unincorporated Sacramento County community of Citrus Heights, containing a population of approximately 69,000, collected

---

[1]California's 58 counties contained 456 incorporated cities on November 30, 1991. (Hornor, Cal. Cities, Towns & Counties (1992 ed.) p. vii, hereafter Hornor.) "Between the passage of Proposition 13 in 1978 and July 1, 1988, 32 cities were incorporated in California, nearly twice the number incorporated in the previous decade." (Assem. Off. of Research, California 2000: Getting Ahead of the Growth Curve (Dec. 1989) p. 12.)

[2]Government Code section 56000 et seq., hereafter the Cortese-Knox Act or the act. Unlabeled section references are to the Government Code.

enough valid signatures to qualify an incorporation petition to the Sacramento County Local Agency Formation Commission (commission), which by law supervises municipal incorporations in the county. Following an environmental review and other proceedings, the commission declared that the law did not require an environmental impact report and approved a resolution setting forth the incorporation proposal. The resolution contained a provision designed to mitigate the financial impact on the county: the proposed city limits were relocated to exclude a sales-tax-rich shopping center. Requests for reconsideration of that resolution followed, in part on the ground that the boundaries still unfairly impacted the county's tax base. The commission adopted a new resolution that moved another shopping center outside the proposed city limits, and then, to further mitigate the county's financial loss, amended that resolution to require that the new city's receipt of property taxes be phased in more slowly. In accordance with section 57103, the commission ordered a confirming election to be held only within the territory of the proposed city.[3]

This lawsuit followed. Plaintiffs include the Sacramento County Board of Supervisors, the Sacramento County Deputy Sheriffs' Association, and Sacramentans to Save our Services. The latter party alleged that it is an unincorporated umbrella organization of some 40 social and community service, labor, law enforcement, and business organizations, many of which receive county funds. Displeased, among other things, with the law's limitation of the confirming election to the voters in the territory to be incorporated, plaintiffs challenged the limitation's constitutionality on the ground that section 57103 denies them equal protection of the laws. (U.S. Const., Amend. XIV, § 1; Cal. Const., art. I, § 7.)

At a hearing on plaintiffs' petition for writ of mandate and complaint for injunctive and declaratory relief, the court entered judgment in plaintiffs' favor on certain environmental impact issues but refused to find the voting limitation in the act unconstitutional.

The Court of Appeal affirmed the judgment on the environmental impact issues, but reversed on the constitutional question. Relying on language in the companion cases of *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 805 [187 Cal.Rptr. 398, 654 P.2d 168] (*Fullerton*), and *Citizens Against Forced Annexation* v. *Local Agency Formation Com.* (1982) 32 Cal.3d 816, 826 [187 Cal.Rptr. 423, 654 P.2d 193]

---

[3]As relevant here, section 57103 provides:

"In any resolution ordering a change of organization or reorganization subject to the confirmation of the voters, the conducting authority shall call an election:

"(a) Within the territory of each city or district ordered to be incorporated, formed, disincorporated, dissolved, or consolidated."

(*Citizens*), the Court of Appeal adopted a standard it conceded to be "a somewhat rubbery ruler": i.e., that "it is a potential voter's *substantial interest* in the change in government by being subjected to *significant effects* of the change which determines whether the residency line has been drawn in such a way as to result in impermissible disenfranchisement and the consequent strict scrutiny of that line." The court decided that the county's electorate had a substantial interest in the incorporation because, given the high level of local government services the county provides in its heavily populated unincorporated area, the incorporation of Citrus Heights would generate significant effects. The court quoted another source that described the unincorporated area as " 'a pseudo-city of 550,000' " that contains almost two-thirds of all county residents and offers " 'municipal services . . . of a very high standard . . . comparable to the level of service received by cities of the same size . . . . The Sheriff's and Public Works Departments may be the largest in the state and offer very sophistica[t]ed services.' " For that reason, the court implied, the incorporation of Citrus Heights would be tantamount to a secession from Sacramento County. The court concluded that section 57103 is unconstitutional as applied to the proposed incorporation because it deprives other voters in the county's unincorporated areas of the right to vote on the question and thereby violates the equal protection clause.

The Court of Appeal fairly interpreted *Fullerton* and *Citizens*. As we shall explain, however, those cases do not mandate a conclusion that section 57103 is unconstitutional.

## I.

The Cortese-Knox Act requires that every unconsolidated county have a local agency formation commission (see § 56325), appointed by local law-making bodies (*ibid.*), to "review and approve or disapprove with or without amendment, wholly, partially, or conditionally, proposals for changes of organization or reorganization. . . ." (§ 56375, subd. (a).) A change of organization includes the incorporation of a city with at least 500 registered voters from unincorporated county land. (§§ 56021, subd. (a), 56043.) Territory to be incorporated as a city must be located in one county. (§ 56110.)

A local agency formation commission ordinarily is a five-member body that includes two county representatives from the board of supervisors (board), two city representatives "each of whom shall be a city officer" (defined in § 56025 as a mayor or city council member), and one member of the general public chosen by the other four. (§ 56325.) The panel must be

enlarged to include two representatives of special districts if the commission of any county (1) orders special districts to be represented thereon, and (2) adopts regulations affecting the "functions and services" of such districts. (§ 56332, subd. (a).)

The act, however, prescribes special treatment for almost one-third of California's 58 counties. The Legislature has created exceptions for four larger counties (§§ 56326-56328): Los Angeles, Santa Clara, San Diego, and, of significance in this case, Sacramento. "In Sacramento County, the commission shall consist of seven members, selected as follows": two board members representing the county; a representative for the City of Sacramento "who is a member of the city council, appointed by the mayor and confirmed by the city council"; a representative for the cities in the county "who is a city officer appointed by the city selection committee"; "[t]wo representing special districts selected by an independent special district selection committee"; and a member of the general public appointed by the other six. (§ 56326.5.)

For reasons we will discuss below, we find it noteworthy that although the four counties that sections 56326 to 56328 except from the general rules are populous, other heavily populated counties, such as Alameda (1990 population 1,279,182) and Orange (1990 population 2,410,556), receive no special treatment.

There are still other exceptions. In counties containing no incorporated city,[4] the commission must have five members, including three from the board and two from the general public appointed by the first three. (§ 56329.) In those counties containing but one city,[5] the commission is also a five-member body: two from the board, one a city officer from the lone city, and two members of the general public appointed by the first three. (§ 56330.)

Either a public petition or an affected local agency's legislative resolution is required to request a change of organization. (§§ 56650, 56800.) As a practical matter, an incorporation request will ordinarily be by petition, because it is difficult to imagine a local government entity seeking the creation of a rival for tax revenues.

The commission cannot act on an incorporation petition unless signed by not less than 25 percent of the registered voters residing in the territory of

---

[4] Currently Alpine, Mariposa, and Trinity. (Hornor, *supra*, at pp. 460-462.)

[5] Currently Calaveras (Angels Camp), Del Norte (Crescent City), Inyo (Bishop), Lassen (Susanville), Modoc (Alturas), Mono (Mammoth Lakes), Plumas (Portola), Sierra (Loyalton), and Tuolomne (Sonora). (Hornor, *supra*, at pp. 460-462.)

the proposed city or by not less than 25 percent of the landowners, which latter group must also own not less than 25 percent of the assessed land value. (§ 56750.) To be valid an incorporation petition in Sacramento County must satisfy nine different descriptive criteria (§ 56700), and all signatures must be gathered in six months (§ 56705, subd. (a)).

Only after these hurdles have been surmounted does the commission have the power to approve or disapprove an incorporation in whole or in part. But the Cortese-Knox Act does not give the commission carte blanche to approve incorporations. Its discretion is limited by requirements, among others, that the incorporation be consistent with the act's intent; that the commission have reviewed the comprehensive fiscal analysis prepared under section 56833.1,[6] the Controller's report prepared under section 56833.3, the report of the commission executive officer (an individual defined in § 56038), and the testimony presented at a public hearing; and that the proposed city likely will be fiscally sound for three fiscal years following its incorporation (§ 56375.1).

The commission cannot ratify an incorporation petition without a public hearing. (§§ 56836, subd. (b), 56069, 56021, subd. (a).) The county is given notice of the hearing (§ 56835, subd. (e)), and its presence is assured in any event because of the law's requirement that board members serve on the commission. In reviewing an incorporation proposal, the commission is required to consider a multitude of factors.[7] An incorporation proposal also triggers an elaborate inquiry into the reapportionment of property tax revenues. (§ 56842.)

---

[6]The comprehensive fiscal analysis must describe at a minimum (§ 56833.1, subd. (d)) the proposed city's revenues and expenses during the three fiscal years following incorporation (*id.*, subds. (a), (b)), and the fiscal effects on "any affected local agency," including the county (see §§ 56014, 56054), during that time (§ 56833.1, subd. (c)). At the request of an "interested party" (not defined in the act, but apparently any "person," see § 56833.3, subd. (d)) the Controller must review the analysis (*id.*, subd. (a)).

[7]These include but are not limited to:

"(a) Population, population density; land area and land use; per capita assessed valuation; topography [and] natural boundaries . . . ; proximity to other populated areas; the likelihood of significant growth in the area, and in adjacent incorporated and unincorporated areas, during the next 10 years.

"(b) . . . [T]he present cost and adequacy of governmental services . . . ; probable future needs for those services . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) The effect of the proposed action . . . on adjacent areas, on mutual social and economic interests, and on the local governmental structure of the county.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(g) Consistency with city or county general and specific plans.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(i) The comments of any affected local agency [including a city or county: see §§ 56014, 56054]." (§ 56841.)

The commission may make its approval conditional on a virtually limitless array of factors (see § 56844, subd. (v)), which are set forth in detail in sections 56843 and 56844.[8] Finally, if the commission abuses its discretion by making a determination not supported by substantial evidence in light of the whole record, the courts may invalidate its decision. (§ 56107.)

After the commission has completed its inquiry and issued a resolution approving or disapproving the proposal (see §§ 56851-56852), a county, or others affected by the decision, may request reconsideration (§ 56857, subd. (a)). Several such requests were made in this case, and, as noted above, the commission acted on them (see § 56858), modifying its resolutions to mitigate the impact of the incorporation of Citrus Heights on the county's finances.

Once the commission has issued its final resolution, the matter is in the hands of the "conducting authority," which in this case is the Sacramento County Board of Supervisors (§ 56029, subd. (d)(1)). The board must conduct a public hearing on the proposal. (§§ 57025, subd. (a), 57050.) If more than 50 percent of the voters in the territory to be incorporated protest the incorporation, the board must end the proceedings. (§§ 57077, subd. (a)(1), 57078, subd. (b); see § 56043.) Otherwise it must order the incorporation, subject to the voters' "confirmation." (§ 57077, subd. (a)(2); see also §§ 57133, subd. (a), 57137 [form of question].)

As the foregoing recitation reveals, the voters' role under the Cortese-Knox Act in confirming an incorporation is rather like that of the masons who place a keystone at the apex of a high and intricate arch. The voters' approval is an essential piece, but as we have shown, by the time the question reaches the electorate the incorporation proposal will already have undergone a labyrinthine process containing elaborate safeguards designed to protect the political and economic interests of affected local governments, residents, and landowners.

## II.

As noted above, the Court of Appeal held section 57103 unconstitutional as applied to the proposed incorporation of Citrus Heights because it

---

[8]These include reimbursement for the acquisition or use of public property (§ 56844, subd. (a)), apportionment of bond obligations between the county and the proposed city (*id.*, subd. (c)), the incurring of new debt (*id.*, subd. (f)), property transfers (*id.*, subd. (h)), employee discharges and modification or termination of employment contracts (*id.*, subd. (*l*)), and the transfer of authority and responsibility among any affected cities and counties for the administration of special tax and special assessment districts (*id.*, subd. (u)).

deprives other voters in Sacramento County's unincorporated areas of a vote on the question and thereby violates the equal protection clause. ■ We begin our discussion of the statute's constitutionality by examining first its facial validity under federal and California precedent, and then its validity, under the principles distilled from that precedent, as applied to the electorate of Sacramento County. We undertake the facial review first because if the law is unconstitutional as violating the equal protection clause on its face, and hence incapable of any valid application, there is no need to consider its application to the incorporation in question. (See generally *Quinn* v. *Millsap* (1989) 491 U.S. 95 [105 L.Ed.2d 74, 109 S.Ct. 2324].) On the other hand, if the law on its face survives an equal protection challenge, our inquiry does not end until we decide whether the law must still be condemned as applied. (See *Milwaukee County Pavers Ass'n* v. *Fiedler* (7th Cir. 1991) 922 F.2d 419, 423.)

■ Not all statutes classify, but many do, and whenever the classification is challenged under the equal protection clause, we must decide its validity under one of the standards of deference required of us. (See *Nordlinger* v. *Hahn* (1992) 505 U.S. __ [120 L.Ed.2d 1, 12, 112 S.Ct. 2326].)

When a law impinges on certain fundamental rights—and the right to vote may be the most fundamental of all (*Wesberry* v. *Sanders* (1964) 376 U.S. 1, 17 [11 L.Ed.2d 481, 491-492, 84 S.Ct. 526]; see also Cal. Const., art. II, § 2)—it will ordinarily be subject to strict judicial scrutiny. Under this very severe standard, a discriminatory law will not be given effect unless its classification bears a close relation to the promoting of a compelling state interest, the classification is necessary to achieve the government's goal, and the classification is narrowly drawn to achieve the goal by the least restrictive means possible. (*Plyler* v. *Doe* (1982) 457 U.S. 202, 217 [72 L.Ed.2d 786, 799, 102 S.Ct. 2382]; *In re Griffiths* (1973) 413 U.S. 717, 721-722 [37 L.Ed.2d 910, 915-916, 93 S.Ct. 2851]; *Bernal* v. *Fainter* (1984) 467 U.S. 216, 219, 227 [81 L.Ed.2d 175, 179, 184-185, 104 S.Ct. 2312]; see also *International Paper* v. *Inhabitants of Town of Jay* (D.Me. 1990) 736 F.Supp. 359, 363, affd. (1st Cir. 1991) 928 F.2d 480; *Huynh* v. *Carlucci* (D.D.C. 1988) 679 F.Supp. 61, 66.)

For most legislation, however, a court will apply the rational basis test. The "standard formulation of the test for minimum rationality" (Tribe, American Constitutional Law (2d ed. 1988) § 16-3, p. 1444, fn. 10) is whether the classification is "rationally related to a legitimate governmental purpose." (*Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 446 [87 L.Ed.2d 313, 324, 105 S.Ct. 3249].) Put another way, the classification must bear some fair relationship to a legitimate public purpose. (*Plyler* v. *Doe, supra,* 457 U.S. at p. 216 [72 L.Ed.2d at pp. 798-799].)

The question we confront, therefore, is whether section 57103 impinges on the right to vote in a manner that requires the application of strict scrutiny. As will appear, the statute does not compel that standard of review.

We agree that section 57103 touches on the right to vote. As it happens, the right to vote does not include a right to compel the state to provide any electoral mechanism whatever for changes of municipal organization. Such line-drawing is a function that the Legislature may reserve to itself. (See *People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 502-503, 505 [96 Cal.Rptr. 553, 487 P.2d 1193].) But when the state has provided for the voters' direct input, the equal protection clause requires that those similarly situated not be treated differently unless the disparity is justified. (See *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663, 665 [16 L.Ed.2d 169, 171-172, 86 S.Ct. 1079].) As we explain, *post,* page 916, federal precedent requires that we view all Sacramento County residents as similarly situated, for all are affected to some degree by the proposed incorporation.

The mere fact, however, that a state law touches on the right to vote does not necessarily require the application of strict scrutiny. (*Burdick* v. *Takushi* (1992) 504 U.S. __ [119 L.Ed.2d 245, 252, 112 S.Ct. 2059].) Rather, "the 'compelling interest' measure must be applied if a classification has a 'real and appreciable impact' upon the equality, fairness and integrity of the electoral process." (*Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438], quoting *Bullock* v. *Carter* (1972) 405 U.S. 134, 144 [31 L.Ed.2d 92, 100, 92 S.Ct. 849].) As we now undertake to explain by reviewing federal precedent, section 57103's impact in the case before us falls well short of the "real and appreciable," for individual interests in voting are much attenuated by the state's plenary power to oversee and regulate the formation of its political subdivisions, and the same power entitles the state to identify as differing in degree the interests of those who may vote under section 57103 and those who may not.

In our federal system the states are sovereign but cities and counties are not; in California as elsewhere they are mere creatures of the state and exist only at the state's sufferance. (*United Building & Constr. Trades* v. *Mayor* (1984) 465 U.S. 208, 215 [79 L.Ed.2d 249, 256-257, 104 S.Ct. 1020]; *Trenton* v. *New Jersey* (1923) 262 U.S. 182, 189-190 [67 L.Ed.2d 937, 942, 43 S.Ct. 534]; Cal. Const., art. XI, §§ 1, subd. (a), 2, subd. (a); § 23002.) Accordingly, the United States Supreme Court has long recognized the states' plenary power to create and dissolve their political subdivisions. In

*Hunter* v. *Pittsburgh* (1907) 207 U.S. 161 [52 L.Ed.2d 151, 28 S.Ct. 40], "the seminal constitutional decision addressing a challenge to a state procedure regulating the formation and organization of local governmental entities" (*Fullerton, supra,* 32 Cal.3d at p. 809 (conc. & dis. opn. of Kaus, J.)), residents of Allegheny, threatened with absorption by much larger Pittsburgh, challenged a Pennsylvania law authorizing the two cities' consolidation if a majority of the total votes cast in a referendum approved consolidation. One ground for the challenge was that the law was "in violation of the law of the land, it being . . . unequal . . . in that it permits the qualified electors of the larger city to overpower and outnumber those of the lesser city, and to annex the lesser city without the vote or consent of a majority of the qualified electors of the lesser city." (207 U.S. at p. 168 [52 L.Ed.2d at p. 155], internal quotation marks omitted.) We read this assignment of error as raising an equal protection challenge on voting-rights grounds.

The federal high court, noting that "[m]unicipal corporations are political subdivisions of the State," concluded, "The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. . . . The State, therefore, at its pleasure may modify or withdraw all such powers . . . , expand or contract the territorial area, unite the whole or a part of it with another municipality [or] repeal the charter and destroy the corporation[,] . . . with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants . . . may by such changes suffer inconvenience [or] . . . the burden of increased taxation, . . . there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it." (*Hunter* v. *Pittsburgh, supra,* 207 U.S. at pp. 178-179 [52 L.Ed.2d at pp. 159-160].)

The foregoing language is, of course, immediately noteworthy for the breadth of its scope, and to a certain extent it bespeaks the judicial confidence of a simpler era. But *Hunter*'s fundamental holding survives. "Although subsequent cases have properly recognized that *Hunter*'s broad language must necessarily be qualified by a state's fundamental constitutional obligation to avoid racial or other invidious discrimination (see, e.g., *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339 [5 L.Ed.2d 110, 81 S.Ct. 125]), recent Supreme Court decisions have not wavered from the basic proposition that states have 'extraordinarily wide latitude . . . in creating various types

of political subdivisions and conferring authority upon them.' [Citation.]" (*Fullerton, supra,* 32 Cal.3d at p. 810 (conc. & dis. opn. of Kaus, J.).)

In *Lockport* v. *Citizens for Community Action* (1977) 430 U.S. 259 [51 L.Ed.2d 313, 97 S.Ct. 1047] (*Lockport*), the court faced a constitutional challenge to a New York law that forbade the implementation of a new Niagara County charter unless approved by concurrent majorities of both the city and noncity residents of the county. The unincorporated-area residents, though fewer in number, voted against the new charter; thus it was defeated even though a majority of the total votes cast favored it.

The concurrent-majority requirement was challenged on equal protection grounds. In deciding the question, the United States Supreme Court, though implicitly deciding the different classes of county resident were similarly situated because living in the county and affected by any charter change (see *Lockport, supra,* 430 U.S. at p. 268 [51 L.Ed.2d at pp. 322-323]), applied the rational basis test. The court stated that if there "is a genuine difference in the relevant interests of the groups that the state electoral classification has created" then an "enhancement of minority voting strength" is permissible unless it "nonetheless amounts to invidious discrimination in violation of the Equal Protection Clause." (*Ibid.*) In other words, if the state's citizens have different interests, then an electoral classification for a referendum that reorganizes local government will survive an equal protection challenge unless it works a purely arbitrary result.

Applying that test, the high court held that "the State's identification of the distinctive interests of the residents of the cities and towns within a county rather than their interests as residents of the county as a homogeneous unit" arose from "the realities of the distribution of governmental powers in New York, and is consistent with our cases that recognize . . . the wide discretion the States have in forming and allocating governmental tasks to local subdivisions [see *Hunter* v. *Pittsburgh, supra,* 207 U.S. 161] . . . ." (*Lockport, supra,* 430 U.S. at pp. 268-269 [51 L.Ed.2d at pp. 322-323].) Thus the state could decide that city and noncity residents possessed genuinely different relevant interests. And the court held that the classification was not arbitrary and hence did not violate equal protection principles. (*Id.* at pp. 272-273 [51 L.Ed.2d at pp. 324-325].)

*Lockport* recognizes the high degree of deference due to a voting-based classification when a state undertakes the essentially political task of apportioning power among its local governmental subdivisions—"constituent units that in a sense compete to provide similar governmental services" (430 U.S. at p. 272 [51 L.Ed.2d at pp. 324-326]).

To be sure, *Lockport* did not decide what standard of deference applies when voters with a more diffuse interest in an incorporation are excluded from voting to confirm the result of a legislative scheme that tries to balance competing interests in the politically freighted incorporation process. To our knowledge, the United States Supreme Court has never addressed this question. ▉ But we conclude that we should not apply strict scrutiny. Under *Lockport, supra,* 430 U.S. 259, the residents in the area to be incorporated and the remaining residents of Sacramento County possess, on the face of the law, genuinely different relevant interests. Thus, though the right to vote is perforce implicated whenever the state specifies that certain people may vote and others may not, we conclude that the essence of this case is not the fundamental right to vote, but the state's plenary power to set the conditions under which its political subdivisions are created. For that reason, the impairment of the right to vote is insufficiently implicated to demand the application of strict scrutiny.[9]

We reach the foregoing conclusion notwithstanding our prior decisions in this area.

*Fullerton, supra,* 32 Cal.3d 779, considered the constitutionality of a State Board of Education (hereafter education board) decision to calve a new

---

[9]In analogous decisions the court has applied a deferential standard to far more direct impairments of individual civil liberties when the government exercises plenary regulatory power in areas substantially related to incidents of sovereignty.

In *Cabell* v. *Chavez-Salido* (1982) 454 U.S. 432 [70 L.Ed.2d 677, 102 S.Ct. 735], the court decided that although state classifications causing economic discrimination against lawfully resident aliens may be subject to heightened scrutiny (see also *Bernal* v. *Fainter, supra,* 467 U.S. 216, 219 & fn. 5 [81 L.Ed.2d 175, 179-180] [stating general rule]), it would not apply the more exacting standard to California law that requires probation officers to be United States citizens. (§ 1031, subd. (a); Pen. Code, § 830.5, subd. (a).) The court reasoned that the requirement warranted judicial deference because it related to "sovereign functions of government" (454 U.S. at p. 438 [70 L.Ed.2d at pp. 683-684]). "[S]trict scrutiny is out of place when the restriction primarily serves a political function: '[O]ur scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives [and] constitutional responsibility for the establishment and operation of its own government . . . .' " (*Id.* at p. 439 [70 L.Ed.2d at p. 684]; see also *Goldman* v. *Weinberger* (1986) 475 U.S. 503, 510 [89 L.Ed.2d 478, 485-486, 106 S.Ct. 1310] [turning back First Amendment challenge to military regulations forbidding the wearing of a yarmulke "even though [the] effect is to restrict the wearing of the headgear required by . . . religious beliefs."]; *Fiallo* v. *Bell* (1977) 430 U.S. 787 [52 L.Ed.2d 50, 97 S.Ct. 1473] [upholding immigration law's classification on the basis of the parent's sex or marital status].)

The military and immigration decisions are only analogues, but we find them useful because in a similar vein the high court has emphasized for decades the states' plenary power to control the formation of local governmental entities. (*Hunter* v. *Pittsburgh, supra,* 207 U.S. 161 [52 L.Ed.2d 151]; *Lockport, supra,* 430 U.S. 259 [51 L.Ed.2d 313].) Such control falls within the ambit of California's " 'constitutional responsibility for the establishment and operation of its own government . . . .' " (*Cabell* v. *Chavez-Salido, supra,* 454 U.S. at p. 439 [70 L.Ed.2d at p. 684].)

school district in Yorba Linda from its Fullerton parent. The education board ordered an election to be held on the secession, and ordered the question submitted to the Yorba Linda electorate only. *Fullerton* overturned the education board's decision.

*Fullerton*'s reasoning is embodied in a plurality opinion signed by three justices. The plurality concluded that the equal protection clause required strict scrutiny to be applied to the education board's decision to limit the vote to Yorba Linda residents. The plurality reasoned that because the decision impinged more than marginally or incidentally on the right to vote, it could be given effect only if the education board could show that it had a compelling interest in excluding the Fullerton residents and that the distinction was necessary to further its purpose. (*Fullerton, supra,* 32 Cal.3d at pp. 799-800.) And because the facts of *Fullerton* did not, in contrast to those of *Lockport, supra,* 430 U.S. 259 [51 L.Ed.2d 313], "present[] an intermediate situation [in which] city and noncity residents each had substantial but different interests in the controversy," that federal precedent did not apply. (32 Cal.3d at pp. 800-801.)

As noted, the reasoning of *Fullerton, supra,* 32 Cal.3d 779, was embodied in a plurality opinion. ■ The case thus lacks authority as precedent (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 841 [4 Cal.Rptr.2d 615, 823 P.2d 1216]; *Farrell* v. *Board of Trustees* (1890) 85 Cal. 408, 415-416 [24 P. 868]), and the doctrine of stare decisis does not require us to defer to it (*Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41]).

Moreover, *Fullerton*'s plurality opinion evinces a great concern that failure to apply strict scrutiny to the election at issue could result in racial segregation. It acquiesces in but describes as "questionable" an administrative decision that the secession would not promote segregation. (32 Cal.3d at p. 793.) Hence, notwithstanding the agency finding, the plurality found an equal protection violation in part because "the racial and financial impact of that Plan are matters of great concern to the residents who will remain in the Fullerton [high school district]." (*Id.* at p. 806.) In the case at bench the parties have not alluded to any similar racial impact: the impact is purely economic.

The issue in *Citizens, supra,* 32 Cal.3d 816, was whether the Municipal Organization Act of 1977 (former § 35000 et seq.) constitutionally entitled the state to limit an election to confirm an annexation to residents of the territory to be annexed. The city in question had about 40,000 voters, while

the territory to be annexed had about a quarter as many. The Legislature had provided that although under certain circumstances, applicable in *Citizens*, the territory's voters must confirm the annexation (former § 35228, subd. (b); see now §§ 57075, subd. (a)(2), 57103, subd. (d)), the annexing city's voters could also vote to confirm the joinder only if, as relevant to the analysis in *Citizens*, the number of registered voters in the territory was 50 percent or more of those in the city. (Former § 35231, subd. (b); see now § 56850.)

Unlike in *Fullerton*, a bare majority concurred in the reasoning of *Citizens*. We decided that "the establishment of the legal relationship contemplated in this case, like the dissolution of a legal relationship involved in *Fullerton*, has a substantial effect upon the residents of both territories involved. We therefore conclude that the relevant geographic confines, for the purpose of constitutional analysis, include[] both the affected territory and the affected city. We must therefore inquire whether the restrictions . . . serve a compelling state interest and are necessary to further that purpose." (*Citizens*, *supra*, 32 Cal.3d at p. 824.)

Applying strict scrutiny, we noted that the government may have a compelling interest to limit the vote to those "specially interested in the matter at issue" (*Citizens*, *supra*, 32 Cal.3d at p. 825, citing *Lockport*, *supra*, 430 U.S. 259, and *Fullerton*, *supra*, 32 Cal.3d 779). And we concluded the Legislature could determine that when "the number of registered voters is not equal to 50 percent of the city's list, the impact of annexation on the city's treasury or voting rolls is insufficient to require an election in the city. [¶] We find no basis to question the line drawn by the Legislature. To be sure, any quantitative measure is in a sense arbitrary; we cannot say that a compelling interest required drawing a line at the case in which the territory has voters equal to 50 percent of the city's number instead of 40 percent or 25 percent. . . ." (32 Cal.3d at p. 826.)

We then turned to the least-restrictive-means prong of the strict scrutiny test. (*Citizens*, *supra*, 32 Cal.3d at p. 827, quoting *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 343 [31 L.Ed.2d 274, 284-285, 92 S.Ct. 995].) We noted that under former law, city residents enjoyed greater political participation in an annexation decision because the city council had to approve the change of organization. "Thus . . . the asserted state interests in avoiding the cost and burden of a city-wide election and the effect of aggregating territorial and city votes were achieved in a manner less restrictive of the political rights of city residents." (32 Cal.3d at p. 827.) But we decided that the state has a compelling interest in permitting unincorporated areas to join cities "even if

the city's residents oppose annexation" (*ibid.*), because the state's interest in "promoting orderly and logical community development, and of providing municipal services to newly urbanized regions" (*id.* at p. 829) was "of compelling importance," and the state's interest would be thwarted if city residents could veto the annexation (*ibid.*).

Because *Citizens, supra,* 32 Cal.3d 816, unlike *Fullerton, supra,* 32 Cal.3d 779, commanded a majority of this court, it requires our considered reexamination. As we now explain, we conclude in hindsight that the reasoning in that case was questionable.

For one, we now find faulty the holding of *Citizens* that a compelling interest in excluding less interested potential voters justified city voters' exclusion because the territory to be annexed contained less than half the number of voters residing in the city. (32 Cal.3d at pp. 826-827.) If strict scrutiny is given to an exclusionary voting scheme, the interest of those excluded from the election must be substantially less than that of those included for the scheme to pass muster. (*Evans* v. *Cornman* (1970) 398 U.S. 419, 422-423 [26 L.Ed.2d 370, 374-375, 90 S.Ct. 1752]; *Kramer* v. *Union School District* (1969) 395 U.S. 621, 632 [23 L.Ed.2d 583, 592-593, 89 S.Ct. 1886].) It is impossible for us to now reconcile *Citizens* with the federal high court's prescription. We can no longer conclude that the city residents' interest in the election outcome was so insubstantial for equal protection purposes: the annexation would have increased the city's size by almost one-quarter. A claim of primary or substantial interest "cannot lightly be accepted," lest "lack of a 'substantial interest' . . . mean no more than a different interest . . . ." (*Evans* v. *Cornman, supra,* 398 U.S. at pp. 422-423 [26 L.Ed.2d at pp. 374-375].) *Citizens* accepted the claim too lightly.

Given that conclusion, we also find constitutionally infirm the reliance of *Citizens* on the goals of orderly development and provision of municipal services (32 Cal.3d at p. 829) to justify the city voters' exclusion from the election. As mentioned above, *Citizens* reasoned that the exclusion was justifiable because the city dwellers might veto the annexation, thereby interfering with those goals. (*Ibid.*) But if the city residents have a fundamental right to vote, then the state's putative interest in excluding them from voting because they might veto the annexation is constitutionally impermissible. ■ As correctly stated in *Fullerton*, "It is, of course, clear that the state cannot claim a compelling interest in excluding voters because of how they may vote. (*Carrington* v. *Rash* (1965) 380 U.S. 89, 94 [13 L.Ed.2d 675, 679, 85 S.Ct. 775].)" (32 Cal.3d at p. 805.) As *Carrington* explained, " 'Fencing out' from the franchise a sector of the population

because of the way they may vote is constitutionally impermissible." (*Carrington* v. *Rash* (1965) 380 U.S. 89, 94 [13 L.Ed.2d 675, 679, 85 S.Ct. 775].)

To the extent that *Citizens, supra,* 32 Cal.3d 816, is inconsistent with the constitutional principles set forth in this opinion, it is not to be followed.

Of course we do not lightly disagree with a comparatively recent decision of this court. ■ The rule of law commands respect only through the orderly adjudication of controversies, and individuals, institutions and society in general are entitled to expect that the law will be as predictable as possible. (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 736-737, 111 S.Ct. 2597]; see *Akron* v. *Akron Center for Reproductive Health* (1983) 462 U.S. 416, 419-420 [76 L.Ed.2d 687, 696-697, 103 S.Ct. 2481].) Nevertheless, stare decisis compels less deference to precedent when constitutional principles are applied to deny effect to an enactment. (See *Akron, supra,* at p. 420 [76 L.Ed.2d at pp. 696-697] [stare decisis "perhaps never entirely persuasive on a constitutional question"].) If we were to follow *Citizens, supra,* 32 Cal.3d 816, and apply strict scrutiny, we would now be compelled to declare section 57103 invalid on constitutional grounds. Such a holding would greatly unbalance the Legislature's careful accommodation of competing local governmental and private interests in the subsequently enacted Cortese-Knox Act and would undermine the lawmakers' power over the existence of cities and counties. In such circumstances stare decisis carries less weight. (See *Payne* v. *Tennessee, supra,* 501 U.S. at p. __ [115 L.Ed.2d at p. 737] [stare decisis is not an inexorable command, and less so in constitutional cases in which correction through legislative action is practically impossible]; cf. *Quill Corp.* v. *North Dakota* (1992) 504 U.S. __ [119 L.Ed.2d 91, 111-112, 112 S.Ct. 1904] (Scalia, J., conc. in part & conc. in judg.) [quoting *Patterson* v. *McLean Credit Union* (1989) 491 U.S. 164, 172-173 [105 L.Ed.2d 132, 147-148, 109 S.Ct. 2363] ("stare decisis has 'special force' where 'Congress remains free to alter what we have done' ")].)

■ We conclude that under applicable precedent we should apply a deferential standard in evaluating the classification set forth on the face of section 57103. The Legislature's traditional power to regulate the formation of political subdivisions allows it to decide that the county residents living outside the territory to be incorporated have a lesser degree of interest in the proposed incorporation than those within, in which case the classification

must be denied effect only if it lacks a rational basis. We turn to that question in part IV, *post.*[10]

### III.

We have not entirely concluded our inquiry into the standard of deference to be applied to the confirming election, however. As will be recalled, plaintiffs' challenge is to section 57103 as it is applied to them. The Court of Appeal held that the equal protection clause requires Sacramento County's unincorporated-area residents to be able to vote on this question because of the county's singular governmental structure. But the Legislature addressed that concern with a commendable degree of attention to the county's demography.

As we have observed, the Cortese-Knox Act provides for a specially composed local agency formation commission for Sacramento County (§ 56326.5); other counties, also populous but not possessing Sacramento County's unusual governmental structure, receive no special consideration. Moreover, in 1973 the Legislature created an entire chapter of the Government Code (§§ 51900-51953) specifically addressing the effect of Sacramento County's unique circumstances on local government. (§ 51903.) The Legislature in effect urged the voters to adopt a consolidated city-county government similar to that of the City and County of San Francisco. (§ 51902.) We take judicial notice (Evid. Code, § 452, subd. (h)) that in November 1990 the voters of Sacramento County rejected a measure that would have created such a consolidated city and county.[11] It was thereafter that the Legislature, still striving to accommodate the county's unusual demography (see Stats. 1991, ch. 439, § 2), enacted section 56326.5, giving the county a unique local agency formation commission. Thus the Legislature has recognized the county's uniqueness and has twice attempted to accommodate its residents.

---

[10]Perhaps because of the United States Supreme Court's guidance, no other jurisdiction has ever cited the relevant discussion in *Fullerton, supra,* 32 Cal.3d 779, or *Citizens, supra,* 32 Cal.3d 816, with approval. Rather, other courts have also held, implicitly or explicitly, that the rational basis test applies to state legislation to exclude extraterritorial residents from voting on a change of municipal organization. (See *City of New York* v. *State* (1990) 158 A.D.2d 169 [557 N.Y.S.2d 914] affd. 76 N.Y.2d 479 [561 N.Y.S.2d 154, 562 N.E.2d 118] [upholding a state law that may allow the borough of Staten Island to separate from New York City under conditions markedly less deferential to the city's interests than is the Cortese-Knox Act to Sacramento County's, and rejecting the reasoning of *Fullerton, supra*]; see also *St. Louis County, Mo.* v. *City of Town and Country* (E.D.Mo. 1984) 590 F.Supp. 731; *Moorman* v. *Wood* (E.D.Ky. 1980) 504 F.Supp. 467, 474-475; *Givorns* v. *City of Valley* (Ala. 1992) 598 So.2d 1338.)

[11]The unincorporated-area residents of Sacramento County rejected the measure by vote of 119,700 to 76,561.

In addition, the facts of this case belie any claim of unusual financial detriment. As noted at the outset, the act's safeguards led to several modifications of the incorporation proposal designed to lessen its fiscal impact on the county. The board calculated that the net loss to the county from the incorporation of Citrus Heights would be some $2.5 million for the first year. The commission asserts that this loss—which it believes to be exaggerated—would amount only to some $5 per unincorporated-area resident. Even using the county's financial data, the commission found the loss would be less than 1 percent of the county's total revenue and 3⅓ percent of its discretionary revenue. The commission impliedly determined that this modest detriment would not bar approving the incorporation plan and submitting it to the voters. And the trial court found that the plan was sufficiently revenue-neutral to survive an abuse-of-discretion challenge, apparently under section 56107. Given the administrative record in this case, we conclude that under any standard of review the trial court's determination was sound.

For the foregoing reasons, we are unable to conclude that the impact of section 57103 was sufficiently real and appreciable in the case of the proposed incorporation of Citrus Heights to require the application of strict scrutiny (*Choudhry* v. *Free, supra,* 17 Cal.3d 660, 664): the Legislature has accommodated the county's unusual demography, and the financial impact on county residents is small.

IV.

Giving section 57103 the presumption of constitutionality to which every statute is entitled (*People* v. *Sanders* (1990) 51 Cal.3d 471, 495 [273 Cal.Rptr. 537, 797 P.2d 561]), we conclude that it must be given effect if it bears some fair relationship to a legitimate public purpose. (*Plyler* v. *Doe, supra,* 457 U.S. 202, 216 [72 L.Ed.2d 786, 798-799].)

In section 56001 the Legislature announced a policy "to encourage orderly growth and development . . . essential to the social, fiscal, and economic well-being of the state," and stated that "the logical formation and determination of local agency boundaries is an important factor in promoting orderly development. . . . [T]he Legislature further finds and declares that this policy should be effected by the logical formation and modification of the boundaries of local agencies."

The foregoing sufficiently shows a legitimate purpose in enacting section 57103. And we conclude that section 57103 is fairly related to the Legislature's declared purpose, for, if large, relatively disinterested majorities could veto incorporations decided through the Cortese-Knox Act's elaborate process, the result might well hinder orderly growth and development. Thus

there is no invidious discrimination of the type referred to in *Lockport, supra*, 430 U.S. 259, 268 [51 L.Ed.2d 313, 322-323].

Unlike in *Fullerton, supra*, 32 Cal.3d 779, which involved a discretionary agency decision to hold an election, the Cortese-Knox Act was constructed with a mighty bulwark against the exercise of arbitrary discretion. The act accommodates competing local governmental and private interests, narrowly channeling the commission's ultimate determination before the territory's voters consider the decision. The election merely asks the affected residents to confirm that they desire self-government. To deny the Legislature the authority to let the potentially incorporating territory's voters have the final say in the matter would be to lessen political participation, not increase it. We do not believe that result is required by our federal and state Constitutions. As we said in *Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 965-966 [104 Cal.Rptr. 297, 501 P.2d 537], "The ideal of maximum participation in democratic decision-making particularly applies to participation in the affairs of the city. One of the most striking and encouraging phenomena of our times has been the deep and renewed interest of citizens in local community matters. To frustrate the endeavor of individuals to fix the unit of their local governance . . . would be to stifle that self-determination. The seeds of democracy lay in the Greek city-state; we would be reluctant to stay the fruition of that democratic expression in the city of today. Neither the state nor federal Constitution sanctions such negation . . . ."

The act's accommodation of competing local interests may be imperfect, but that is not enough, by itself, to offend constitutional principles. As counsel remarked at oral argument, "It's not a question of what would be the perfect arrangement as a matter of political science; it's what the Constitution requires."

We hold that section 57103's limitation does not violate the equal protection clause of the United States or the California Constitution, either on its face or as applied to this proposed incorporation.

## V.

The Court of Appeal's judgment is reversed with instructions to direct the trial court to enter judgment for defendant with respect to the constitutionality of section 57103. The Court of Appeal is to take such further action on the question of attorney fees as this disposition warrants.

In addition, certain plaintiffs, and amici curiae Counties of Contra Costa and Santa Cruz, have requested partial publication of that part of the Court

of Appeal opinion concerning the California Environmental Quality Act. (Cal. Rules of Court, rules 976(d), 976.1, 978(a).) The request is denied. Denial of a request for publication or partial publication is not to be construed as a reflection on the merits of such an opinion. (See *id.*, rules 978(c), 979(e).)

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.