BEA, Circuit Judge,
concurring:
I concur in the result of this case. I write separately to express my disagreement with the majority’s default determination that persons convicted of domestic violence misdemeanors are thereby disqualified from the core right of the Second Amendment to possess firearms for defense of the home. First, however, let me detail the points on which the majority and I agree.
I.
Based on the weight of authority of our sister circuits, the majority opinion decides to apply to this Second Amendment case the familiar “scrutiny” tests that have become the method of analysis of challenged *1143 legislation under the First Amendment. Because appellant does not argue this point but accepts it, see Blue Br. at 24 (arguing that strict scrutiny should apply), I will treat the point as waived and accept the application of the tiers of scrutiny analysis to the Second Amendment jurisprudence. But see Heller v. Dist. of Columbia, 670 F.3d 1244, 1271 (D.C.Cir.2011) (Kavanaugh, J., dissenting) (“Are gun bans and regulations to be analyzed based on the Second Amendment’s text, history, and tradition[,] ... [o]r may judges re-calibrate the scope of the Second Amendment right based on judicial assessment of whether the law advances a sufficiently compelling or important government interest to override the individual right? ... In my view, Heller and McDonald leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.”); Eugene Volokh, Implementing the Right To Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1443, 1461-73 (2009) (“[Ujnitary tests such as ‘strict scrutiny,’ ‘intermediate scrutiny,’ ‘undue burden,’ and the like don’t make sense here” in the Second Amendment context because the language of Heller seems to foreclose scrutiny analysis).
I agree with the majority that, if we are to apply the “tiers of scrutiny” to our Second Amendment jurisprudence, the correct way to do so is the two-step inquiry adopted by several other circuits, whereby we “(1) ask[ ] whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, ... apply the appropriate level of scrutiny.” Maj. Op. at 1136.
I also agree with the majority’s application of step one. It correctly holds that there is insufficient evidence to conclude that the prohibition on misdemeanants owning firearms is “longstanding.” Therefore, Chovan’s “Second Amendment rights are intact.” Maj. Op. at 1137 (quoting United States v. Chester, 628 F.3d 673, 681-82 (4th Cir.2010)).
I further agree with the majority opinion when, at step two, it “recognize[s] that 18 U.S.C. § 922(g)(9) substantially burdens Second Amendment rights.”[1] Maj. Op. at 1138.
Finally, I agree with the majority that if one applies intermediate scrutiny, § 922(g)(9) would satisfy this level of scrutiny. The governmental interest in preventing a possible recidivist from committing more serious violence through the use of a gun is a “substantial governmental interest,” and § 922(g)(9) constitutes a “reasonable fit” between the legislation and its goal. Maj. Op. at 1138^41.
II.
The sole basis of my disagreement with the majority opinion is. the “default” effect of the misdemeanor conviction. I call it “default” because, without explanation,[2] the majority held Chovan’s domestic violence misdemeanor conviction deprives him of his core right to gun possession for self- *1144 defense in the home, which, the Supreme Court held in Heller, the Second Amendment gives a “law-abiding, responsible citizen.” [3] The majority opinion in our case states that Chovan’s constitutional “claim is not within the core right identified in Heller — the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense — by virtue of [his] criminal history as a domestic violence misdemean-ant.” Maj. Op. at 1134-35 (quoting Chester, 628 F.3d at 682-83). Therefore, it concludes, because § 922(g)(9)’s burden, although “substantial! ],” is not total, intermediate scrutiny is the correct standard. Id. at 1138. “In sum,” the majority opinion concludes, “ § 922(g)(9) does not implicate the core Second Amendment right....” Id. at 1138.
Why?
a.
The majority opinion holds that Chovan forfeited his core Second Amendment right when he was convicted of a misdemeanor. Id. at 1138 (stating that Chovan can no longer be considered a “law-abiding, responsible citizen ... by virtue of [his] criminal history as a domestic violence misdemeanant”). In this, the majority are not alone. The Fourth Circuit has made a similar conclusion. See Chester, 628 F.3d at 682-83.
This default disqualification of misde-meanants from the “core” right of the Second Amendment resembles the Supreme Court’s “disqualification” language regarding felons in Heller. The Court in Heller seemed to equate the status of a felon or of one mentally ill with a presumptive disqualification from the Second Amendment right. See Dist. of Columbia v. Heller, 554 U.S. 570, 631, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (linking “disquali-fecation]” with being a felon or insane); id. at 635, 128 S.Ct. 2783 (“Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.”) (emphasis added).
Just as Heller found felons to be presumptively disqualified from the protection of the Second Amendment, so the majority have found a domestic violence misde-meanant, Chovan, to be presumptively disqualified from the “core” protection of the Second Amendment. This conclusion seems to stem from a perceived similarity between felons and domestic violence mis-demeanants. This conclusion, however, is mistaken. Throughout history, felons have been subject to forfeiture and disqualification, but misdemeanants, in direct contrast to felons, have not.
At common law, there was a fundamental difference between felons and misde-meanants. In particular, felonies resulted in forfeiture of property and rights. 2 William Blackstone, Commentaries *96-97 (discussing forfeiture as the historical foundation of felony); id. at *377 (describing the possible punishments of serious crime as including “confiscation, by forfeiture of lands, or moveables, or both, or of the profits of lands for life: others induce a disability, of holding offices or employments, being heirs, executors, and the like”); see C. Kevin Marshall, Why Can’t Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol’y 695, 715 (2009) (recognizing that at common law a felony could result in attainder and “civil death,” whereby the felon could no longer “perform!] legal functions, such as being a witness or suing”). Misdemeanors, on the other hand, did not; as the historian Theo *1145 dore Plucknett put it, “most of the characteristics of criminal proceedings did not attach to misdemeanours. Thus, they were not subject to ... forfeiture....”. Theodore Frank Thomas Plucknett, A Concise History of the Common Law.456 (1956). Even today, felons can suffer numerous restrictions on their constitutional rights. See United States v. McCane, 573 F.3d 1037, 1049 (10th Cir.2009) (Tymko-vich, J., concurring) (“[T]he application of § 922(g) to a violent felon ... would appear appropriate under any Second Amendment reading. After all, felons lose out on fundamental rights such as voting and serving on juries, and face discrimination that need only survive rational basis review.”). Indeed, as this court has held, “felons are categorically different from the individuals who have a fundamental right to bear arms.” United States v. Vongxay, 594 F.3d 1111, 1115 (9th Cir.2010); see McLaughlin v. City of Canton, Miss., 947 F.Supp. 954, 975 (S.D.Miss.1995) (finding that “The historical distinction between felonies and misdemeanors is more than semantic. Traditionally, dire sanctions have attached to felony convictions which have not attached to misdemeanor convictions. Many of these sanctions are in force today. Disenfranchisement was, and remains, one such sanction. Another such sanction is that which prohibits felons from owning or possessing firearms” and concluding that laws disenfranchising misde-meanants are subject to strict scrutiny).
Thus, although felon disqualification from the scope of the Second Amendment makes sense from an historical perspective, the same cannot be said for misde-meanants. Felon disqualification from the entire scope of the Second Amendment does not justify misdemeanant disqualification from the core of the Second Amendment. See Volokh, supra, at 1498 (“If felon bans are upheld on the grounds that felons have historically been seen as outside the -scope of various constitutional rights, then felon bans would offer a poor analogy for bans on possession by misde-meanants (even violent misdemean-ants) .... ”).
b.
Not only does the status-based analogy of felons to misdemeanants not make sense; selecting intermediate scrutiny as the correct level at which to review a categorical, status-based disqualification from the core right of the Second Amendment also does not make sense.
Many circuits have chosen intermediate scrutiny to analyze statutes that undeniably burden Second Amendment rights. They have often done so based on an analogy between the right to free speech and the right to keep and bear arms. Indeed, as the Seventh Circuit has recognized, “[b]oth Heller and McDonald suggest that First Amendment analogues are ... appropriate.” Ezell v. City of Chicago, 651 F.3d 684, 706 (7th Cir.2011). The Seventh Circuit went on to summarize the tiers of scrutiny at work in the realm of the First Amendment:
In free-speech cases, ... content-básed regulations are presumptively invalid, and thus get strict scrutiny. On the other hand, time, place, and manner regulations on speech need only be reasonable and justified without reference to the content of the regulated speech.... [Regulations in a traditional .public or designated public forum get strict scrutiny, while regulations in a nonpublic forum must not discriminate on the basis of viewpoint and must be reasonable in light of the forum’s purpose.
Id. at 708 (internal quotations marks and citations omitted). As the Tenth Circuit has stated, the right to keep and bear arms “is qualified by what one might call the ‘who,’ ‘what,’ ‘where/ ‘when/ and ‘why.’ ” United States v. Huitron-Guizar, *1146 678 F.3d 1164, 1165-66 (10th Cir.2012). The “when” and “where” qualifications are known in free-speech jurisprudence as time, place, and manner restrictions. The “what” and “why” qualifications are content-based restrictions.
That leaves the “who,” and it remains a sticking point. Categorical restrictions of constitutional rights based on an individual’s class or status fit ill with free-speech jurisprudence. The Seventh Circuit has argued that categorical limits on the Second Amendment are analogous to the categorical limits in the free-speech context, such as obscenity or defamation. United States v. Skoien, 614 F.3d 638, 641 (7th Cir.2010) (“Categorical limits on the possession of firearms would not be a constitutional anomaly. Think of the First Amendment, which has long had categorical limits: obscenity, defamation, incitement to crime, and others.”). These categorical limits on free speech, however, are based on what is said, not who is saying it. Cf. Skoien, 614 F.3d at 649-51 (Sykes, J., dissenting) (“Adapting First Amendment doctrine to the Second Amendment context is sensible in some cases----But this particular First Amendment analogy doesn’t work here.”). Our constitutional jurisprudence does not analyze status-based restrictions on free speech under intermediate scrutiny. A street-corner harangue on the beauties of revolution can perhaps be prohibited on grounds that it presents a clear and present danger of violence; but it cannot be prohibited solely because the speaker has a misdemeanor record.
Judge Jones of the Fifth Circuit recognized this incompatability between intermediate scrutiny and status-based disqualifications in her recent dissent from a denial of rehearing en banc. Nat'l Rifle Ass’n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334 (5th Cir.2013) (Jones, J., dissenting from denial of rehearing en banc). She disagreed with the opinion’s conclusion that intermediate scrutiny was the correct standard to apply to §§ 922(b)(1) and (c)(1), which prohibit federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185 (5th Cir.2012). The majority in that case chose intermediate scrutiny because “the ban on handgun sales to minors under 21 is analogous to longstanding, presumptively lawful bans on possession by felons and the mentally ill.” Id. at 206. Judge Jones argued that such categorical exclusions should not be analyzed under intermediate scrutiny.
The panel’s level of scrutiny is based on an analogy between young adults and felons and the mentally ill, as if any class-based limitation on the possession of firearms justifies any other, so long as the legislature finds the suspect “discrete” class to be “dangerous” or “irresponsible.” On such reasoning, a low level of scrutiny could be applied if a legislature found that other groups — e.g. aliens, or military veterans with PTSD— were “dangerous” or “irresponsible.”
NRA, 714 F.3d at 345 (Jones, J., dissenting). Judge Jones is correct. Categorical curtailment of constitutional rights based on an individual’s status requires more rigorous analysis than intermediate scrutiny.
c.
Moreover, when the majority hold that Chovan’s status as a misdemeanant excludes him from the core protection of the Second Amendment, it construes Heller as erecting not one but two barriers preventing persons from asserting their right to keep and bear arms.
The majority quote two passages from Heller as pertinent to ascertaining Cho- *1147 van’s Second Amendment rights. The first Heller passage discusses presumptive disqualifications from the scope of the Second Amendment.
Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.
Heller, 554 U.S. at 626-27, 128 S.Ct. 2788. In a footnote, the Court held that these restrictions were “presumptively lawful,”[4] and that the “list does not purport to be exhaustive.” Id. at 627 n. 26, 128 S.Ct. 2783.
A second Heller passage, according to the majority, defines the “core” right protected by the Second Amendment: “And whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. at 635, 128 S.Ct. 2783.
The majority construe the Heller Court in these two passages to be recognizing two different hurdles separating citizens from the core right of the Second Amendment. The first hurdle determines whether someone is a felon or mentally ill. If so, this person is presumptively disqualified from the Second Amendment’s protection. I agree with this interpretation'of the first passage.
The majority construe the second passage, however, as recognizing a further hurdle over which individuals must leap to assert their core right to keep and bear arms in defense of the home. Although individuals have access to a non-core Second Amendment right if they are not felons or mentally ill, the majority conclude, only those deemed “law-abiding” and “responsible” can lay claim to the “core” right of the Second Amendment to possess firearms for self-defense in the home. Without articulating a reason, the majority construe the terms “law-abiding” and “responsible” as recognizing a second standard, stricter than the ' “presumptively lawful” disqualification of felons and the *1148 mentally ill. That second standard, the majority conclude, again without explanation, excludes domestic violence misde-meanants. Maj. Op. at 1134-35.
I construe the second passage differently. The terms of the second passage correspond precisely to the terms of the first passage. They are two sides of the same coin. “Law-abiding” in the second passage corresponds to “felon” in the first passage. “Responsible” in the second passage corresponds to “mentally ill” in the first passage. Thus, I read Heller’s second passage as restating the first passage. Heller does not cast doubt on “prohibitions on the possession of firearms by felons and the mentally ill,” which is another way of saying that the Second Amendment establishes rights to possess firearms for defense of the home in “law-abiding, responsible citizens.”
If, as under the majority’s reading, the terms “law-abiding” and “responsible” are not tied to “felons” and “mentally ill,” how are the lower courts to recognize the limits of the “law-abiding, responsible citizen” standard? Why should we stop with domestic violence misdemeanors in defining categorical disqualifications from the core right of the Second Amendment? Why not all misdemeanors? Why not minor infractions? Could Congress find someone once cited for disorderly conduct to be “not law-abiding” and therefore to have forfeited his core Second Amendment right? Why should not legal determinations that were made without any trial at all disqualify individuals from the core Second Amendment right? Note, § 922(g) does not stop with convictions. Section 922(g)(8), for instance, even curtails Second Amendment rights based on restraining orders, with no trial at all, but rather with only a hearing of which the defendant received notice and the opportunity to participate.[5] Compare United States v. Reese, 627 F.3d 792, 802 (10th Cir.2010) (finding intermediate scrutiny to be the correct level of scrutiny under which to analyze § 922(g)(8) because it targets a “narrow class[ ] of persons who, based on their past behavior, are more likely to engage in domestic violence,” and upholding the law on that ground), with United States v. Knight, 574 F.Supp.2d 224, 226 (D.Me.2008) (finding that § 922(g)(8) satisfies strict scrutiny because “reducing domestic violence is a compelling government interest” and the prohibition is “temporary” and therefore “narrowly tailored”). Why should we not accept every congressional determination for who is or is not “law-abiding” and “responsible” for Second Amendment purposes?
Why not? Because Heller was a constitutional decision. It recognized the scope of a passage of the Constitution. The boundaries of this right are defined by the Constitution. They are not defined by Congress. See NRA, 714 F.3d at 345 (Jones, J., dissenting) (“In any event, it is circular reasoning to adopt a level of scrutiny based on the assumption that the legislature’s classification fits that level.”).
*1149 As we have seen, in the Founding period, felonies historically resulted in disqualification from certain rights, but misdemeanors did not, nor did infractions, nor restraining orders. I therefore conclude that domestic violence misdemeanants are not disqualified from the core protection, of the Second . Amendment, and that § 922(g)(9) accordingly should be analyzed, not under intermediate scrutiny, but under strict scrutiny. See United States v. Engstrum, 609 F.Supp.2d 1227, 1231 (D.Utah 2009) (finding that strict scrutiny is the correct rigor of analysis to apply to § 922(g)(9) because, first, Heller described the right to keep and bear arms as “fundamental,” 554 U.S. at 593, 128 S.Ct. 2783, and second, because Heller classified the Second Amendment right alongside the First and Fourth Amendments which are traditionally analyzed under strict scrutiny, but still upholding the statute under strict scrutiny analysis).
III.
To be sure, strict scrutiny is a rigorous standard. The Supreme Court has called it “ ‘strict’ in theory but usually ‘fatal’ in fact.” Bernal v. Fainter, 467 U.S. 216, 219 n. 6, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984) (“Only rarely are statutes sustained in the face of strict scrutiny.”) (citing Gerald Gunther, The Supreme Court, 1971 Term — Foreword: In Search of Evolving Doctrine oñ a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L.Rev. 1, 8 (1972)). But see Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (“[W]e wish to dispel the notion that strict scrutiny is strict in theory, but fatal in fact.”) (internal quotation marks omitted).
Scholarly analysis shows that federal courts uphold around thirty percent of the laws they analyze under strict scrutiny. Adam Winkler, Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts, 59 Vand. L.Rev. 793, 862-63 (2006). Moreover, federal- courts uphold Congressional statutes under strict scrutiny about half the time. Id. at 818.
There are several theories regarding what the purpose of strict scrutiny is, and what sorts of governmental acts can satisfy its rigorous requirements. One theory defines strict scrutiny as upholding laws that undeniably burden constitutional rights only “when the government can demonstrate that infringements are necessary to avoid highly serious, even catastrophic harms.” Richard H. Fallon, Jr., Strict Judicial Scrutiny, 54 UCLA L.Rev. 1267, 1302 (2007) (describing several competing theories of strict scrutiny analysis); see City of Richmond v. J.A. Croson Co., 488 U.S. 469, 521, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (Scalia, J., concurring) (arguing that “At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb ... can justify an exception to” constitutional rights under strict scrutiny analysis); Lee v. Washington, 390 U.S. 333, 334, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (Black, J., concurring) (stating that the governmental goals of “maintaining security, discipline, and good order” in a prison can satisfy strict scrutiny analysis).
As Justice Thomas has argued, another way to say “compelling governmental interest” is “pressing public necessity.” Fisher v. Univ. of Texas at Austin, — U.S. -, 133 S.Ct. 2411, 2423 n. 1, 186 L.Ed.2d 474 (2013) (Thomas, J., concurring). This “pressing public -necessity” consists “only [of] those measures the State must take to provide a bulwark against anarchy, or to prevent violence.” Grutter v. Bollinger, 539 U.S. 306, 353, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (Thomas, J., concurring in part and dissenting in part).
*1150 I have already suggested that free speech doctrines should hot be applied to Second Amendment restrictions that are based on the status of the individual. See supra, Part Il.b. More analogous to status-based restrictions on the right to keep and bear arms would be restrictions on the freedom of association. Freedom of association cases often involve governmental action that restricts association based- on the status or conduct of the individuals, just as § 922(g)(9) restricts the right to keep and bear arms for particular persons based on their status and previous conduct. In both cases, moreover, this governmental action is often directed towards preventing violence and preserving public safety.
Federal courts apply strict scrutiny to freedom of association cases. Roberts v. United States Jaycees, 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (“Infringements on [the right to associate] may be justified by regulations adopted to serve compelling state interests ... that cannot be achieved through means significantly less restrictive of associational freedoms.”). Despite applying strict scrutiny, however, federal courts still often uphold statutes affecting freedom of association;in particular, federal courts uphold freedom of association regulations under a strict scrutiny analysis “when the asserted justification for the laws was public safety or effective law enforcement.” Winkler, supra, at 868; see, e.g., Tabbaa v. Chertoff, 509 F.3d 89, 92 (2d Cir.2007) (finding under strict scrutiny analysis that customs officials did not violate plaintiffs’ freedom of association rights by detaining and searching plaintiffs at the border when they returned from an Islamic conference in Canada because “given the intelligence [the officials] received, the inspection policy was narrowly tailored to achieve the compelling governmental interest in preventing potential terrorists from entering the United States”); Grider v. Abramson, 180 F.3d 739, 749, 752 (6th Cir.1999) (finding under strict scrutiny analysis that municipal officials did not violate plaintiffs’ freedom of association rights with their crowd control plan during a KKK rally because the plan “constituted a necessary constraint narrowly fashioned to further a compelling governmental interest in public safety and order” to prevent “disorderly conduct, breaches of the peace, and serious injuries to persons and property”).
In our case, too, based on the data the majority discuss in detail, the government’s interest in public safety and preventing gun violence is sufficiently compelling and narrowly tailored to satisfy those prongs of strict scrutiny analysis. See Maj. Op. at 1138-41; cf. United States v. Armstrong, 706 F.3d 1, 8 (1st Cir.2013) (finding that § 922(g)(9) satisfies constitutional scrutiny “under any standard”).
Section 922(g)(9) frames the governmental interest: to prevent life-threatening harm to a predictable group of victims, i.e. those who have suffered domestic violence, from a predictably violent set of convicted criminals, i.e. those who have been convicted of a domestic violence misdemeanor. As the majority note, there is a sufficient body of penalogical knowledge regarding recidivism in domestic violence cases to satisfy the compelling interest element required in strict scrutiny analysis. Maj. Op. at 1139-40; see also Skoien, 614 F.3d at 642-44 (discussing these studies in detail). Moreover, as the Supreme Court has stated, § 922(g)(9) targeted a particular deficiency in the felon-in-possession statute.
Existing felon-in-possession laws, Congress recognized, were not keeping firearms out of the hands of domestic abusers, because “many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies.” 142 Cong. Rec. 22985 *1151 (1996) (statement of Sen. Lautenberg). By extending the federal firearm prohibition to persons convicted of “misdemeanor crime[s] of domestic violence,” proponents of § 922(g)(9) sought to “close this dangerous loophole.” M[] at 22986.
United States v. Hayes, 555 U.S. 415, 426, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009).
As to “narrow tailoring,” the second element of the strict scrutiny test, it is important to note that § 922(g)(9) applies only to those domestic violence convicts who remain convicted. Misdemeanants hold in their own hands the power to remove the taint of conviction and rejoin the protected class of those who may possess firearms. They can seek pardon, expungement, set-aside of their conviction, or restoration of civil rights. 18 U.S.C. § 921(a)(21)(B).[6] The frequency of such expungements, moreover, seem to have risen in many states since the enactment of § 922(g)(9). See Robert A. Mikos, Enforcing State Law in Congress’s Shadow, 90 Cornell L.Rev. 1411,1463-64 & nn. 187-88 (2005).
In answer to Chovan’s as-applied challenge, California, where Chovan was convicted, makes expungement of misdemean- or convictions a right. Under § 1203.4a(a) of the California Penal Code, all misde-meanants can have their convictions expunged after completion of their sentences if they have not been charged with or convicted of a further crime and have “lived an honest and upright life.” Moreover, defendants must be informed of this right to expungement “either orally or in writing, at the time he or she is sentenced.” Id. at § 1203.4a(c)(l). Prosecuting attorneys have fifteen days from the filing of the petition for dismissal with the court to object. Id. at § 1203.4a(f). This participation of the district attorneys in the process allows California to maintain some adversarial integrity in the expungement proceedings, as the district attorney can oppose the motion if the convict’s rehabilitation is doubtful. This system places the evaluation of the convict’s rehabilitation, vel non, in the state. Indeed, California courts have interpreted § 1203.4a(a) to mandate expungement when misdemean-ants have complied with its terms. See, e.g., People v. Chandler, 203 Cal.App.3d 782, 250 Cal.Rptr. 730, 734 (1988) (“[A] defendant moving under Penal Code section 1203.4a is entitled as a matter of right to its benefits, upon a showing that he has fulfilled the conditions of probation for the entire period of probation. It was apparently intended that when a defendant has satisfied the terms of probation, the trial court should have no discretion but to carry out its part of the bargain with the defendant.”) (citations and quotation marks omitted).
Section 922 is in part a federalism-based statute. It looks to state law, passing restrictions on certain convicts based on decisions made by state legislatures and courts. Section 922 also ceases to apply if convicts have satisfied the state procedures for expungement. This helps the statute satisfy the narrow tailoring prong of strict scrutiny. It allows those who no longer pose a threat to society to demonstrate their rehabilitation and reclaim their Second Amendment rights. It is not a blunt instrument. Rather, it targets only *1152 those whom the states continue to deem not rehabilitated. It is therefore narrowly tailored to the goal of preventing only those who pose the greatest risk to potential domestic violence victims from possessing guns.
With the aforementioned considerations in mind, I conclude that § 922(g)(9) advances a compelling governmental interest, and does so in a narrowly tailored manner. Therefore, the statute satisfies strict scrutiny analysis.
IV.
The Heller opinion did not provide lower courts with explicit guidance on how to analyze challenges to statutes under the Second Amendment. If we are to apply the familiar tiers of scrutiny analysis in Second Amendment cases, instead of a pure textual, historical, and structural analysis, however, history and precedent still dictate a more stringent examination of these issues than the majority allow. Strict scrutiny has become an integral aspect of much of our constitutional jurisprudence. See Fallon, supra, at 1268 (ranking strict scrutiny “among the most important doctrinal elements in constitutional law”). After applying strict scrutiny to § 922(g)(9), I come to the same conclusion as do the majority, and uphold the law. The close look afforded by strict scrutiny, however, ensures that the law truly is narrowly tailored to further a compelling governmental interest, and ensures that the Second Amendment’s contours are drawn by the Constitution, and not by Congress.

. I do not, however, think the burden "is lightened” to some degree by the exceptions for those whose convictions have been pardoned, expunged, or set-aside, and for those who have had their civil rights restored. Maj. Op. at 1138. If the convictions are no longer extant, there is no burden whatsoever. If the conviction remains, the full burden obtains. There is no “light” burden.
Removal of the convictions is relevant, however, to the narrow-tailoring requirement of the strict scrutiny test. See infra, at 49-51.

. I would say ipse dixit, except some other courts dixenmt’d first. See, e.g., Chester, 628 F.3d at 682-83. So, this is more of an argument from the non-binding authority of our sister circuits’ opinions.

. It should be noted that the guns Chovan was found to possess were (1) at his home, and (2) of the kind traditionally used for defense of the home (a Winchester shotgun, a .22 caliber rifle, .22 caliber handgun, and a Baldwin & Company antique shotgun).

. Although the court in Heller said laws that disqualify felons from possessing firearms were "presumptively lawful,” it did not explain this phrase. See United States v. Marzzarella, 614 F.3d 85, 91 (3d Cir.2010) (stating that "the phrase 'presumptively lawful' could have different meanings.... [It] could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny,” but preferring the first reading); United States v. Williams, 616 F.3d 685, 692 (7th Cir.2010) (stating that " 'presumptively lawful’ ... by implication[ ] means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge”). Heller does not say whether this "presumption” was rebuttable or fire-buttable. If it is rebuttable, moreover, by what can it be rebutted? Again, the opinion is silent. Perhaps the best reading of this footnote is that the presumption is irrebutta-ble. Just as structural error "requires automatic reversal,” Washington v. Recuenco, 548 U.S. 212, 218, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006), so the status of being a felon automatically establishes that those individuals do not have the constitutional right to possess firearms. See United States v. Vongxay, 594 F.3d 1111, 1117 (9th Cir.2010) (upholding § 922(g)(l)’s restriction on firearm possession for felons, and noting that "to date no court that has examined Heller has found 18 U.S.C. § 922(g) constitutionally suspect” (internal quotation marks omitted)). The language in Heller suggests that felons are, for now at least, conclusively outside the scope of the Second Amendment.

. The statute 18 U.S.C. § 922(g)(8) states:
[It shall be unlawful for any person] who is subject to a court order that — (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(1) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury, [to possess in or affecting commerce, any firearm or ammunition.]

. The statute 18 U.S.C. § 921(a)(21)(B) states: A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.