BYBEE, Circuit Judge,
concurring and concurring in the judgment:
I concur in full in Judge McKeown’s thoughtful opinion for the court. Her opinion captures the unsettled nature of the current state of the law and offers a way through the morass of conflicting approaches. I write separately to explain why the law of alienage remains so unclear and how we might better approach it.
The courts’ reaction to state implementation of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (“PRWORA”) demonstrates the conundrum of our current Equal Protection doctrine as applied to aliens. Compare Soskin v. Reinertson, 353 F.3d 1242, 1254 (10th Cir.2004) (applying rational basis scrutiny to Colorado’s PRWORA-based alien eligibility restrictions); Khrapunskiy v. Doar, 12 N.Y.3d 478, 881 N.Y.S.2d 377, 909 N.E.2d 70, 76 (2009) (holding that the Equal Protection Clause does not apply to New York’s PRWORA-based alien eligibility restrictions); Hong Pham v. Starkowski, 300 Conn. 412, 16 A.3d 635, 661 (2011) (applying rational basis scrutiny to Connecticut’s PRWORA-based alien eligibility restrictions); with Finch v. Commonwealth Health Ins. Connector Auth., 459 Mass. 655, 946 N.E.2d 1262, 1279-80 (2011) (applying strict scrutiny to Massachusetts’ PRWORA-based alien eligibility restrictions); Ehrlich v. Perez, 394 Md. 691, 908 A.2d 1220, 1243-44 (2006) (applying strict scrutiny to Maryland’s PRWORA-based alien eligibility restrictions); Aliessa ex rel. Fayad v. Novello, 96 NY.2d 418, 730 N.Y.S.2d 1, 754 N.E.2d 1085, 1098 (2001) (applying strict scrutiny to New York’s PRWORA-based alien eligibility restrictions); see also Basiente v. Glickman, 242 F.3d 1137, 1143 (9th Cir.2001) (applying rational basis scrutiny to PRWORA-based restriction on aliens eligible for federal benefits in the Commonwealth of the Northern Marianas).
It is not surprising that courts might divide over the application of equal protection rules to the PRWORA. Even where courts agree on the standard of review, judges may disagree over the application of the standard. See, e.g., Fisher v. Univ. of Tex. at Austin, — U.S.—, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013); Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003); Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); United States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). What is remarkable is that seventy-five years after United States v. Carotene Products Co. announced the need for “more exacting judicial scrutiny” for “discrete and insular minorities,” 304 U.S. 144, *889 153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), and more than forty years since Graham v. Richardson declared classification based on alienage subject to strict scrutiny, 403 U.S. 365, 375, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), we should be divided over the proper standard of review for classifications based on alienage.
As discussed below, the Graham doctrine — while ostensibly clear when issued — has been, in fact, riddled with exceptions and caveats that make consistent judicial review of alienage classifications difficult. In the years since Graham was decided, the Supreme Court has applied different levels of scrutiny depending on whether the state or the federal government established the challenged restriction, whether the restriction involved economic rights or the democratic process of self-government (often stretching that concept), whether the restriction involved undocumented aliens, and whether the discriminatory classification was created by Congress or an administrative agency. A review of the history of alienage jurisprudence, with a particular review of Graham — both what it said and how it has been applied (and not applied) in the past forty years — suggests that it is time to rethink the doctrine. As I explain below, I am persuaded that an alternative approach based on preemption analysis would bring welcome clarity to this area. Employing preemption analysis instead of equal protection analysis in alienage cases will not spare us hard cases, but it offers us a mode of analysis that is more consistent with the Constitution, our history, and the Court’s cases since Graham.
I
For over a century, the Supreme Court has recognized that aliens are “persons” entitled to the protection of the Fifth and Fourteenth Amendments. See Wong Wing v. United States, 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); see also Graham, 403 U.S. at 371, 91 S.Ct. 1848 (“It has long been settled ... that the term ‘person’ in this context encompasses lawfully admitted resident aliens ... and entitles both citizens and aliens to the equal protection of the laws-”). For the first half of the twentieth century, the Court was generally deferential to state alienage restrictions, so long as they did not interfere with “[t]he authority to control immigration — to admit or exclude aliens — [which] is vested solely in the Federal Government.” Truax v. Raich, 239 U.S.33, 42, 36 S.Ct. 7, 60 L.Ed. 131 (1915) (declaring unconstitutional an Arizona law requiring that employers with more than five employees hire at least 80 percent native-born citizens since “denying] to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode ... ”) But where a state’s discriminatory classification related to a public interest without a clear nexus to a field of federal control, the Court often upheld the restriction. See Clarke v. Deckebach, 274 U.S. 392, 396, 47 S.Ct. 630, 71 L.Ed. 1115 (1927) (holding an Ohio law banning alien ownership of pool halls constitutional as it did not amount to “plainly irrational discrimination”); Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915) (upholding statute criminalizing the employment of aliens on public works contracts); Terrace v. Thompson, 263 U.S. 197, 221, 44 S.Ct. 15, 68 L.Ed. 255 (1923) (holding a Washington law banning alien ownership of land constitutional because “[t]he quality and allegiance of those who own, occupy and use the farm lands within [a State’s] borders are matters of highest importance ...”); Heim v. McCall, 239 U.S. 175, 194, 36 S.Ct. 78, 60 L.Ed. 206 *890 (1915) (upholding a prohibition of employment of aliens on public works contracts constructing New York City subway in light of “the special power of the state over the' subject-matter [government employment]”); Patsone v. Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914) (holding constitutional a law excluding aliens from hunting wild game and noting that “a state may classify [aliens] with reference to the evil to be prevented ... if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared ... ”).
The Court’s approach to alienage restrictions began to change after the Second World War, notably in Takahashi v. Fish & Game Comm’n, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). In Takahashi, a Japanese resident alien fisherman challenged a California law barring aliens from obtaining commercial fishing licenses. The Court struck down the law on preemption grounds, but in the course of its discussion, it referred to the civil rights law enforcing the Fourteenth Amendment:
The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.... State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration ...
Id. at 419, 68 S.Ct. 1138 (internal citation omitted). The Court then quoted the Civil Rights Act of 1866, now codified at 42 U.S.C. § 1981:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws a proceedings for the security of persons and property as is enjoyed by white citizens ...
Id. Finding that this section “extend[s] to aliens as well as to citizens,” id. (footnote omitted), the Court declared that Congress had adopted the Civil Rights Act “in the enactment of a comprehensive legislative plan for the nation-wide control and regulation of immigration and naturalization ...” Id. (emphasis added). Accordingly, California’s provision conflicted with “a general policy” found in “[t]he Fourteenth Amendment and the laws adopted under its authority” that “all persons lawfully in this country shall abide ‘in any state’ on an equality of legal privileges with all citizens under nondiscriminatory laws.” Id. at 420, 68 S.Ct. 1138. Without a “special public interest,” California’s law had to yield to federal law. Id.
It was in light of this fluctuating doctrine that the Court decided Graham in 1971.
II
The root of much of the current confusion over the courts’ treatment of alienage lies in Graham itself. Graham dealt with restrictions on public benefits imposed by Arizona and Pennsylvania. In Arizona, persons permanently and totally disabled were not eligible for assistance under a federal program in which Arizona participated if they were not citizens of the United States or had resided in the U.S. for fewer than fifteen years. 403 U.S. at 366-67, 91 S.Ct. 1848. Pennsylvania had a general assistance program, one not funded in any part by the federal government, that limited participation to U.S. citizens. Id. at 368, 91 S.Ct. 1848. The Court proceeded on two distinct analytic fronts: the *891 Equal Protection Clause and federal preemption based on the Supremacy Clause. First, it addressed the state classifications under the Equal Protection Clause of the Fourteenth Amendment. U.S. Const, amend. XIV, § 1 (“No State shall ... deny to any person within its jurisdiction the equal protection of the laws.”). Although the Court had mentioned the Fourteenth Amendment in connection with state restrictions on aliens in previous cases, the Court had never rested its judgment solely on the Equal Protection Clause.[1] In Graham, for the first time, the Court established a level of scrutiny, holding that “classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.” 403 U.S. at 372, 91 S.Ct. 1848 (footnotes omitted). This meant that state classifications based on alienage must fall unless the state can show “a compelling state interest by the least restrictive means available.” Bernal v. Fainter, 467 U.S. 216, 219, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984). In Graham, Arizona’s and Pennsylvania’s “desire to preserve limited welfare benefits for its own citizens [was] inadequate to justify” the restrictions, 403 U.S. at 374, 91 S.Ct. 1848, and “a concern for fiscal integrity” was not compelling. Id. at 375, 91 S.Ct. 1848. With respect to Arizona, whose state plan — including its alienage restriction — was previously approved by the Secretary of Health, Education & Welfare, the Court construed federal law not to authorize the restrictions because “Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.” Id. at 382, 91 S.Ct. 1848.
Second, and alternatively, the Court in Graham found the state laws preempted by federal law, thereby violating the Supremacy Clause. U.S. Const, art. VI, § 2 (“This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land”). The Court found that the state restrictions on alienage could not “withstand constitutional scrutiny” because of “[t]he National Governmentf’s] ... ‘broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.’ ” Graham, 403 U.S. at 376-77, 91 S.Ct. 1848 (quoting Takahashi, 334 U.S. at 419, 68 S.Ct. 1138). Describing Congress’s “comprehensive plan for the regulation of immigration and naturalization,” including aliens who become “public charges,” the Court found that “Congress has not seen fit to impose any burden or restriction on aliens who become indigent after their entry into the United States.” Id. at 377, 68 S.Ct. 1138. Accordingly, “State laws that restrict the eligibility of aliens for welfare benefits merely because of their alienage conflict with these overriding national policies in an area constitutionally entrusted to the Federal Government.” Id. at 378, 68 S.Ct. 1138. As “the States ‘can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states,’ ” Arizona’s and Pennsylvania’s “laws en-croachfing] upon exclusive federal power ... [were] constitutionally impermissible.” Id. at 378, 68 S.Ct. 1138 (quoting Takaha *892 shi, 334 U.S. at 419, 68 S.Ct. 1138), 380, 68 S.Ct. 1138.
Graham was a watershed case in equal protection analysis because it placed classifications based on alienage in the same category as classifications based on race, see Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944), and in a more protected class than classifications based on gender or illegitimacy, see Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (gender); Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (illegitimacy). The implications of Graham were significant. Under an important line of cases, the Graham rule would have bound the federal government to the same degree as the states. In Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), decided the same day as Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Court held that the same equal protection principles applied to the federal government as applied to the states. That proposition was not obvious, because the Equal Protection Clause is found in the Fourteenth Amendment, which by its terms applies to the states and grants Congress the power to enforce it. U.S. Const, amend. XIV, §§ 1, 5. In Bolling, however, the Court declared it “unthinkable that the same Constitution would impose a lesser duty on the Federal Government.” 347 U.S. at 500, 74 S.Ct. 693. Although the Court in Brown held that state discrimination on the basis of race violated the Equal Protection Clause of the Fourteenth Amendment, the Court in Bolling held that federal discrimination on the basis of race violated the equal protection component of the Due Process Clause of the Fifth Amendment. Id. at 499, 74 S.Ct. 693; see also Brown, 347 U.S. at 495 & n. 12, 74 S.Ct. 686. Since Bolling, it has been well established that the “Court’s approach to Fifth Amendment equal protection has always been precisely the same as to the equal protection under the Fourteenth Amendment.” Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). See United States v. Windsor, — U.S. —, 133 S.Ct. 2675, 2695, 186 L.Ed.2d 808 (2013) (“The liberty protected by the Fifth Amendment’s Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws.”); , United States v. Paradise, 480 U.S. 149, 166 n. 16, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality opinion of Brennan, J.) (“[T]he reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth ...”); Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (“Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.”). But see Hampton v. Mow Sun Wong, 426 U.S. 88, 100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (“Although both [the Fifth and Fourteenth] Amendments require the same type of [equal protection] analysis, ... the two protections are not always coextensive.”).
In the Court’s most extensive discussion to date of the Bolling principle, the Court recounted that in Bolling “the Court for the first time explicitly questioned the existence of any difference between the obligations of the Federal Government and the States to avoid racial classifications.” Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 215, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). While “Bolling’s, facts concerned school desegregation, ... its reasoning was not so limited.” Id. The Court repeated “ ‘that the Constitution of the United States, in its present form, forbids, so far as the civil and political rights are concerned, discrimination by the General Government, or by the States, against any *893 citizen because of his race.’” Id. at 216, 115 S.Ct. 2097 (emphasis in original) (quoting Bolling, 347 U.S. at 499, 74 S.Ct. 693) (other citation and quotation marks omitted). The Court also underscored that the equal protection component of the Fifth Amendment is “an obligation equivalent to that of the States.” Id.; see id. at 217, 74 S.Ct. 693 (“the equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable”). The only exception might be “a few contrary suggestions appearing in eases in which we found special deference to the political branch of the Federal Government to be appropriate to detract from this general rule.” Id. at 217-18, 74 S.Ct. 693 (citing Hampton, 426 U.S. at 88, 96 S.Ct. 1895).
This last caveat was huge. It turns out that, in the area of immigration and naturalization, the “unthinkable,” Bolling, 347 U.S. at 500, 74 S.Ct. 693, was exactly what the Court had been thinking for more than one-hundred years. The obligations of the federal government and the states with respect to aliens were indeed “[]distinguishable,” Adarand, 515 U.S. at 217, 115 S.Ct. 2097. In a venerable line of cases, the Court had approved the political branches’ control over the privileges that aliens enjoy in the United States. See, e.g., Fiallo v. Bell, 430 U.S. 787, 792-96, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); Hines v. Davidowitz, 312 U.S. 52, 62-68, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Fong Yue Ting v. United States, 149 U.S. 698, 711-14, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); Henderson v. Mayor of New York, 92 U.S. 259, 273-74, 23 L.Ed. 543 (1876); Chy Lung v. Freeman, 92 U.S. 275, 280, 23 L.Ed. 550 (1876). At the same time, the Court had established that the states had some, but not unlimited, control over aliens’ privileges within the state. See Part I, supra.
From the outset, the Graham rule, simpliciter, was unsupportable. See Adarand, 515 U.S. at 217-18, 115 S.Ct. 2097 (acknowledging that the equal protection component of the Fifth Amendment is coextensive with that of the Fourteenth Amendment except with respect to some of the alien cases); United States v. Verdugo-Urquidez, 494 U.S. 259, 273, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (“[Our decisions] expressly accordf ] differing protection to aliens than to citizens, based on our conclusion that the particular provision in question were not intended to extend to aliens in the same degree as to citizens.”); David P. Currie, The Constitution in the Supreme Court: The Second Century, 1888-1986, at 500 (1990) (Graham “carried this line of authority to the extreme of declaring alienage as suspect a classification as race — a characterization so implausible that it would soon have to be revised.”) (footnote omitted).
At the first opportunity, the Court declined to impose the equal protection component of the Fifth Amendment on the federal government. Indeed, the Graham rule, as a mode of equal protection analysis, has never been fully applied to the federal government since Graham. Just five years after Graham, in Mathews v. Diaz, the Court phrased the issue as “whether Congress may condition an alien’s eligibility for participation in a federal medical insurance program on continuous residence in the United States for a five-year period and admission for permanent residence.” 426 U.S. 67, 69, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). The Court did not begin with Graham and equal protection analysis. Rather, it divided the alienage question into two parts: May Congress discriminate between citizens and aliens? And may Congress discriminate between different groups of aliens? As to the first question, the Court had little difficulty finding that “[i]n the exer *894 cise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.... The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is ‘invidious.’ ” Id. at 79-80, 96 S.Ct. 1883. The Court made no acknowledgment of Graham or Bolling. With respect to the second question, and again without even mentioning Graham or Bolling, the Court reasoned that since it was
obvious that Congress has no constitutional duty to provide all aliens with the welfare benefits provided to citizens, the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others.
Id. at 82, 96 S.Ct. 1883 (emphasis added). In the end, the Court declined to “substitute [its] judgment for that of Congress in deciding which aliens shall be eligible to participate in the supplementary insurance program on the same conditions as citizens.” Id. at 84, 96 S.Ct. 1883. Only then did the Court consider Graham, which it had no difficulty distinguishing “because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government.... Classification [of aliens] by the Federal Government is a routine and normally legitimate part of its business.” Id. at 84-85, 96 S.Ct. 1883.
The same day, the Court decided Hampton v. Mow Sun Wong, 426 U.S. at 88, 96 S.Ct. 1895. In Hampton, lawful permanent residents were denied federal employment by the Civil Service Commission because they were not U.S. citizens. This time, however, the Court began with an equal protection analysis consistent with Graham. Citing Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), and In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), two cases in which the Court had applied Graham’ s equal protection analysis to strike down state restrictions on alien employment, the Court similarly struck the federal restrictions on the employment of non-citizens. The Court linked Graham and Bolling, but to distinguish them: “Although both [the Fifth and Fourteenth] Amendments require the same type of analysis ... the two protections are not always coextensive.” Hampton, 426 U.S. at 100, 96 S.Ct. 1895.[2] The Court observed that Sugarman dictated that the Court strike the restriction on federal employment of aliens unless there was an “overriding national interest[ ],” id. at 101, 96 S.Ct. 1895, proof of which would have to come from Congress or the President, and not just from the Civil Service Commission, id. at 103, 105, 116, 96 S.Ct. 1895.
What is odd about the juxtaposition of these two cases is the way in which the Court followed on the one hand, and virtually ignored on the other, the equal protection principles it had previously announced. In Hampton, the Court followed *895 equal protection principles, finding that the federal employment restrictions were presumptively invalid under Sugarman unless there was a compelling governmental interest and the rules “were expressly mandated by the Congress or the President. ...” Id. at 108, 96 S.Ct. 1895. When the Court couldn’t find such an interest mandated by the elected branches, the law fell. It would have been easy enough in Mathews for the Court to have analyzed the restrictions on federal benefits under equal protection, but the Court made Graham an afterthought. Had it started with Graham, the Court would have considered the statutory restrictions on aliens receiving federal benefits presumptively invalid and then asked whether there was a compelling governmental interest. See Gerald M. Rosberg, The Protection of Aliens from Discriminatory Treatment by the National Government, 1977 Sup.Ct. Rev. 275, 294 (“The existence of these special federal interests may explain why the federal government can demonstrate a compelling need for a particular classification even though a state could not. But it does not in an obvious way explain why the burden of justification on the federal government should be different from the burden on a state.”). Given the Court’s statements in Hampton, and given its analysis of the national interest in naturalization and immigration, the Court might well have honored Congress’s preferences, even under strict scrutiny. But see Hampton, 426 U.S. at 117, 96 S.Ct. 1895 (Brennan, J., concurring) (joining the majority opinion “with the understanding that there are reserved the equal protection questions that would be raised by congressional or Presidential enactment of a bar on employment of aliens by the Federal Government”). Instead, the Court largely ignored the equal protection component of the Fifth Amendment and left us scratching our heads over two entirely separate modes of analysis of challenges to federal restrictions on alienage.[3]
The Bolling equivalence principle aside, the Court has also qualified Graham as applied to the states. The Court has tended to affirm state classifications regarding political or democratic rights afforded to aliens and has tended to invalidate those classifications that limited the distribution of economic benefits or regulated commercial opportunities, altering the level of scrutiny on an almost case-by-case basis. Following Graham, the Court has applied strict scrutiny to some state restrictions on aliens — see, e.g., Bernal, 467 U.S. at 216, 104 S.Ct. 2312 (holding unconstitutional a Texas law prohibiting aliens from becoming notaries); Nyquist v. Mauclet, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (holding unconstitutional a New York law barring resident aliens from state assistance for higher education); In re Griffiths, 413 U.S. at 717, 93 S.Ct. 2851 (holding unconstitutional a Connecticut law barring aliens from becoming lawyers); Sugarman, 413 U.S. at 634, 93 S.Ct. 2842 (holding unconstitutional a New York City law making aliens ineligible for city employment) — but not to others. In one case it applied a form of intermediate scrutiny. See Plyler v. Doe, 457 U.S. 202, *896 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (holding unconstitutional a law requiring alien schoolchildren to pay for education that was free to citizens). In still other cases, the Court has applied rational basis scrutiny instead. See, e.g., Cabell v. Chavez-Salido, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982) (holding constitutional a California law requiring probation officers to be citizens); Ambach v. Norwick, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (holding constitutional a New York law requiring public schoolteachers to be citizens); Foley v. Connelie, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (holding constitutional a New York law limiting appointment to state police force to citizens). And in still other cases, the Court has largely ignored the Equal. Protection Clause altogether. See Toll v. Moreno, 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982) (holding that-the University of Maryland’s policy barring domiciled aliens and their- dependents from acquiring instate tuition violated the supremacy clause); Elkins v. Moreno, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) (holding that whether resident aliens can become domiciliaries of Maryland is a matter of state law the federal courts should leave to state courts as a matter of comity); DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (holding that a California law prohibiting an employer from knowingly employing an illegal alien was not unconstitutional as a regulation of immigration or as being preempted under the Supremacy Clause).
The curious point for my purposes is not so much whether the Court upheld or struck down the state restrictions in the face of an equal protection challenge, but that the Court did not apply a consistent standard of review.[4] It would be one thing if the Court, consistently applying strict scrutiny, upheld some state restrictions while striking others. It is an entirely different matter when the Court doesn’t apply consistently its standard of review. With all due respect for the difficulty of these questions, the Court’s indecision over the equal protection standard of review gives these cases the appearance that the standard has been manipulated to accommodate the Court’s intuition over the result in the particular case. And its case law makes lower court review of alienage restrictions all the more difficult.
Ill
This brief history should make us rethink whether Graham’s equal protection analysis alone can explain the Court’s cases. Obviously, I believe that it cannot. But I do believe that Graham’s preemption analysis, not its equal protection analysis, has significant explanatory power here.
A preemption analysis is more securely anchored in the Constitution itself. There can be little question that “[t]he Government of the United States has broad ... power over the subject of immigration and the status of aliens.” Arizona v. United States, — U.S.—, 132 S.Ct. 2492, 2498, 183 L.Ed.2d 351 (2012). The constitutional sources for that power are both textual and structural. Most obviously, Article I grants Congress express authority to “es *897 tablish an uniform Rule of Naturalization.” U.S. Const, art. I, § 8, cl. 4. In addition, the authority of the political branches to determine the terms on which aliens may immigrate to the United States, whether to visit, study, work, marry, or remain, rests on an undefined amalgamation of powers vested in Congress and the President. Those powers include the Foreign Commerce Clause, id. art. I, § 8, cl. 3 (“Congress shall have Power ... to regulate Commerce with foreign Nations”), and the foreign affairs powers derived from the President’s authority “to make Treaties” and “appoint Ambassadors, other public Ministers and Consuls,” id. art. II, § 2, cl. 2, and to “receive Ambassadors and other public Ministers,” id. art. II, § 3. See Toll, 458 U.S. at 10, 102 S.Ct. 2977. The Court has also relied on the “inherent power [of the United States] as sovereign to control and conduct relations with foreign nations,” Arizona, 132 S.Ct. at 2498, 132 S.Ct. 2492, including concepts core to “the conduct of foreign relations, the war power, and the maintenance of republican form of government,” Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 96 L.Ed. 586 (1952). See also United States v. Valenzuela-Bernal, 458 U.S. 858, 864, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (“The power to regulate immigration — an attribute of sovereignty essential to the preservation of any nation — has been entrusted by the Constitution to the political branches of the Federal Government.”); Shaughnessy v. United States ex rel. Mezei 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (“[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government’s political departments largely immune from judicial control”). In sum, the Court has said, “ ‘over no conceivable subject is the legislative power of Congress more complete than it is over’ the admission of aliens.” Fiallo, 430 U.S. at 792, 97 S.Ct. 1473 (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)).
The Court has frequently employed preemption as its mode of analyzing state restrictions based on alienage. In general, there are three ways Congress may preempt a law through legislation. See Arizona, 132 S.Ct. at 2500-01, 132 S.Ct. 2492. First, because Congress possesses plenary authority over immigration and naturalization, Congress may expressly preempt certain laws. See, e.g., Chamber of Commerce v. Whiting, — U.S. —, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) (discussing 8 U.S.C. § 1324a(h)(2), which forbids “any State or local law imposing civil or criminal sanctions ... upon those who employ ... unauthorized aliens”). Second, where state laws actually conflict with federal laws, the state laws must yield. Arizona, 132 S.Ct. at 2502 (holding that a law making failure to comply with federal alien-registration requirements a state misdemeanor was preempted). Third, even where Congress has not expressly preempted state laws, but “has enacted a complete scheme of regulation ..., states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.” Hines, 312 U.S. at 66, 61 S.Ct. 399. This is so-called field preemption.[5] *898 See, e.g., Toll, 458 U.S. at 17, 102 S.Ct. 2977 (holding that the Immigration and Nationality Act was a comprehensive regulation of domiciled, nonimmigrant G-4 visa holders and that it preempted Maryland’s refusal to grant such persons in-state tuition); Hines, 312 U.S. at 74, 61 S.Ct. 399 (holding that the Alien Registration Act of 1940 preempted Pennsylvania’s alien registration requirements).
Even where Congress has not legislated specifically, the Court has enforced a kind of “dormant immigration”[6] analysis. The principle of “dormant” legislative authority was first recognized in a commerce case, Cooley v. Bd. of Wardens: “Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress.” 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996 (1852). Since that time, the Court has defended Congress’s power to legislate exclusively on matters requiring a national or uniform rule, irrespective of whether Congress has in fact adopted such a rule. The Court has invoked the same principle in the context of immigration. In Henderson v. Mayor of the City of New York, it struck New York and Louisiana provisions that taxed passengers arriving from overseas. 92 U.S. at 259. Citing Cooley, the Court wrote that taxing arriving aliens imposed a burden on Congress’s powers under the Foreign Commerce Clause and on our “international relations”:
A regulation which imposes onerous, perhaps impossible, conditions on those engaged in active commerce with foreign nations, must of necessity be national in its character. It is more than this; for it may properly be called international. It belongs to that class of laws which concern the exterior relation of this whole nation with other nations and governments.
Id. at 273. Accordingly, “[t]he laws which govern the right to land passengers in the United States from other countries” “may be and ought to be, the subject of uniform system or plan.” Id. See Hines, 312 U.S. at 66-67, 61 S.Ct. 399; Chy Lung, 92 U.S. at 280 (“The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States.... If it be otherwise, a single State can, at her pleasure, embroil us in disastrous quarrels with other nations.”). But see DeCanas, 424 U.S. at 354-55, 96 S.Ct. 933 (“[T]he Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised.... [T]he fact that aliens are the subject of a state statute does not render it a regulation of immigration ... ”).
The Court has recently enforced Congress’s dormant powers where, even though state law does not actually conflict with federal law, it is inconsistent with a national rule or scheme. See Arizona, 132 S.Ct. at 2504-05 (observing that Congress’s “comprehensive framework does not impose federal criminal sanctions on [aliens who seek or engage in unauthorized work]” and that Arizona’s law imposing criminal penalties on unauthorized alien employees “conflicts with] the method of *899 enforcement” because “Congress [must have] decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment”).
In some, even comprehensive, legislative schemes, Congress has expressly authorized states to regulate certain aspects of an alien’s privileges within the state. The Court recently approved state laws that relied on such authorization. In Chamber of Commerce v. Whiting, Congress expressly preempted “ ‘any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ ... unauthorized aliens.’ ” 181 S.Ct. at 1968 (quoting 8 U.S.C. § 1324(h)(2) (emphasis added)). In effect, the parenthetical was express congressional non-preemption. In response, Arizona adopted the Legal Arizona Workers Act in which it provided that employers who knowingly or intentionally employed unauthorized aliens could have their business licenses suspended or revoked. The Court rejected a claim that Arizona’s law was either expressly or impliedly preempted by federal law. With respect to express preemption, the Court held that federal law “expressly preempts some state powers dealing with the employment of unauthorized aliens and it expressly preserves others. We hold that Arizona’s licensing law falls well within the confines of the authority Congress chose to leave to the States.” Id. at 1981. With respect to the claim of implied preemption, the Court observed that “[g]iven that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority.” Id. (plurality opinion). The Court noted that Arizona’s “tools” mirrored the federal provisions, including “us[ing] the Federal Government’s own definition of ‘unauthorized alien,’ ... rel[ying] solely on the Federal Government’s own determination of who is an unauthorized alien, and requiring] Arizona employers to use the Federal Government’s own system for checking employee status.” Id. at 1987.
All of which is to suggest that preemption analysis, not equal protection, is the better approach, for preemption analysis can be applied more consistently to alien-age cases, with more predictable outcomes for parties and courts.
IV
The choice between a pure preemption analysis and a pure equal protection analysis yields very different results in this case.
A
In my view, and consistent with the majority opinion, Hawaii’s health insurance program at issue in this ease is not expressly preempted by any federal law. Neither does it actually conflict with any federal law, nor does it obstruct in any way the congressional scheme. Hawaii’s law most resembles the law at issue in Chamber of Commerce: Hawaii has responded to a congressional authorization, and it has mirrored federal law to make its law consistent with the federal scheme.
As the majority opinion explains, Congress has established three categories of aliens for purposes of federal and state benefits. Maj. Op. at 878-79; see Pimentel v. Dreyfus, 670 F.3d 1096, 1100-01 (9th Cir.2012). One group of aliens — including permanent resident aliens, refugees and asylees, and aliens who are serving or have served in the Armed Forces of the United States — “shall be eligible for any State public benefits.” 8 U.S.C. § 1622(b). A second group of aliens — including those aliens here without authorization — are “not *900 eligible for any State or local public benefit,” unless the state adopted a law “after August 22, 1996, ... affirmatively providing] for such eligibility.” Id. § 1621(a), (d). Finally, the third group includes all other aliens. For this group, “a State is authorized to determine the eligibility for any State public benefits.” Id. § 1622(a). The plaintiffs in this case, who are nonim-migrant aliens admitted under the Compact of Free Association with the United States,[7] fall into this third category.
Section 1622(a), as plainly as words can express it, authorizes states to decide whether to make that class of aliens eligible for state benefits. It is, as in Chamber of Commerce, express non-preemption. See Chamber of Commerce, 131 S.Ct. at 1981. As in Chamber of Commerce, Hawaii “uses the Federal Government’s own definition of [‘qualified alien’], [and] relies solely on the Federal Government’s own determination of who is a[] ‘[qualified alien’].” Id. at 1987. By definition, Hawaii’s act is authorized by Congress and, accordingly, is not preempted. Id. (plurality opinion). Hawaii has “ ‘neither added[ed] to nor take[n] from the conditions lawfully imposed by Congress.’ ” Graham, 403 U.S. at 378, 91 S.Ct. 1848 (quoting Takahashi 334 U.S. at 419, 68 S.Ct. 1138). Acting consistent with Congress’s scheme, and at its invitation, Hawaii’s law cannot “encroach upon exclusive federal power.” Id. at 380, 91 S.Ct. 1848.
Nor does Hawaii’s scheme violate Congress’s dormant immigration powers. There is no reason for federal courts to intervene here to defend Congress’s power over immigration and naturalization. Congress drew the lines clearly: there are classes of aliens who may come to the United States and must be treated on the same basis as if they were citizens; there are other classes of aliens — those who have not come to our shores lawfully- — who may not receive such benefits, even if the states were otherwise disposed to afford them our largesse. Finally, there is the third class of aliens — including those entering the United States lawfully under COFA — for whom Congress has determined that the states need not treat them as citizens, but may do so at the state’s discretion. Where Congress has made such a determination, the courts should only second-guess that judgment if Congress itself has overstepped its constitutional authority. I do not believe there is any basis for that theory.
B
If we follow a pure equal protection model, it is unlikely that Hawaii’s scheme can muster constitutional scrutiny. Following Graham, Hawaii’s law discriminates between citizens and aliens, and, for that reason (as the district court correctly pointed out), Hawaii must satisfy strict scrutiny. Hawaii will have to show that it has a compelling state interest in treating resident aliens differently from citizens, and even if it can show such an interest, it will have to prove that it has narrowly tailored its program. Hawaii can likely *901 offer two interests. First, it adopted its law because of budgetary reasons. This has never been thought to be a sufficient reason to justify discrimination that is subject to increased judicial scrutiny. See Mem’l Hosp. v. Maricopa Cnty., 415 U.S. 250, 263, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (“[A] State may not protect the public fisc by drawing an invidious distinction between classes of its citizens”); Graham, 403 U.S. at 375, 91 S.Ct. 1848 (“[A] concern for fiscal integrity is not compelling.”); Shapiro v. Thompson, 394 U.S. 618, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (“a State has a valid interest in preserving the fiscal integrity of its programs .... But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens.”); see also Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 547-49, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). Second, Hawai'i can point to PRWORA itself and Congress’s declaration that a state that “follow[s] the Federal classification in determining the eligibility of ... aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling government interest of assuring that aliens be self-reliant in accordance ■with national immigration policy.” 8 U.S.C. § 1601(7). Despite the appeal of Congress’s finding, this is not likely a sufficient justification. In Graham, the Court made clear that “Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.” 403 U.S. at 382, 91 S.Ct. 1848. More importantly, the Court has previously held that, whatever reasons the federal government may offer for its own discrimination policy, the states cannot rely on that same justification. The states must supply their own sovereign reasons and cannot cite the reasons of a coordinate government. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 504, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (“Congress has made national findings that there has been societal discrimination in a host of fields. If all a state or local government need do is find a congressional report on the subject to enact a set-aside program, the constraints of the Equal Protection Clause will, in effect, have been rendered a nullity.”). In sum, if we looked exclusively to equal protection principles, I think it is likely that Hawaii’s law would fall.
V
The equal protection principle announced in Graham has proven unsustainable. In the end, I think that preemption analysis will prove more consistent with the text and structure of the Constitution, the Court’s pre-Graham cases, and even with the history of the Fourteenth Amendment itself.[8] Were it within my power, I would adopt preemption analysis as the appropriate analysis for evaluating the al-ienage cases. Because I am bound by Graham and the cases that follow it, I join Judge McKeown’s opinion for the court.
The Fourteenth Amendment, of course, took account of these differences in the Privileges and Immunities Clause, which provided that the “privileges or immunities *902 of citizens of the United States” could not be abridged, and in the Due Process and Equal Protection Clauses, which applied to “any person." The current confusion is due in no small part to the Court’s disastrous decision in The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873). In that case, as Justice Field pointed out, the Court effectively read the Privileges or Immunities Clause out of the Fourteenth Amendment, rendering the Clause a “vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage.” Id. at 96 (Field, J., dissenting). Understandably, to compensate, the Court later invigorated the Equal Protection and Due Process Clauses, which had narrower purposes, but applied more broadly to all “persons.” See McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 3029-31, 177 L.Ed.2d 894 (2010). The Court’s treatment of aliens under the Equal Protection Clause has been, in large measure, both counter-textual and counter-historical. See David P. Currie, The Constitution in the Supreme Court: The First Hundred Years, 1789-1888, at 342-50, 387 & n.133 (1985); John Harrison, Reconstructing the Privileges or Immunities Clause, 101 Yale L.J. 1385, 1390, 1442-47 (1992); Earl M. Maltz, The Constitution and Nonracial Discrimination: Alienage, Sex, and the Framers’ Ideal of Equality, 7 Const. Comment 251, 257-65 (1990).

. Even in Yick Wo, where the Court first declared aliens to be “persons" within the scope of the Fourteenth Amendment, the Court cited several sources of authority, including the U.S. treaty with China, the Fourteenth Amendment, and the Civil Rights Act of 1866. 118 U.S. at 368-69, 6 S.Ct. 1064.

. The only other reference I can locate in which the Court refers to both Bolling and Graham was later in the same Term in Examining Board of Engineers, Architects, and Surveyors v. Flores de Otero, where the Court struck down a Puerto Rico law restricting civil engineers to U.S. citizens. 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). One of the questions was the constitutional status of Puerto Rico. For the Court's purposes, Puerto Rico's status did not matter: “If the Fourteenth Amendment is applicable, the Equal Protection Clause nullifies the statutory exclusion. If, on the other hand, it is the Fifth Amendment and its Due Process Clause that apply, the statute's discrimination is so egregious that it falls with the rule of [Bolling v. Sharpe].” Id. at 601, 96 S.Ct. 2264.

. Compare Erwin Chemerinsky, Constitutional Law: Principles and Policies § 9.5.3 at 744 (3d ed.2002) (“the Court's decisions can be criticized for so openly manipulating the level of scrutiny. The Court could have used strict scrutiny....”) with David F. Levi, Note, The Equal Treatment of Aliens: Preemption or Equal Protection?, 31 Stan. L.Rev. 1069, 1091 (1979) ("The Supreme Court's creation in Graham v. Richardson of a suspect classification of alienage has not been a successful experiment_[T]he equal treatment of resident aliens by the states is required by preemption rather than by the equal protection clause.”).

. As the Majority notes, Maj. Op. 887 n. 10, ■ the Dissent suggests both that Hawaii’s denial of equal benefits to COFA residents is- subject to strict scrutiny, Dissent at 904-05, and that Congress has given the states "broad discretion to discriminate against aliens in the provision of welfare benefits,” Dissent at 909, all of which underscores the difficulty of applying a uniform standard of review in cases involving alienage, especially when they involve the intersection of federal schemes and state schemes that have — at least in the abstract — been afforded differing levels of scrutiny.

. The distinction between actual conflict preemption and field preemption is not always clear. See, e.g., Arizona, 132 S.Ct. at 2502 (finding that “the Federal Government has occupied the field of alien registration” but then concluding that “[p]ermitting [Arizona] to impose its own penalties for the federal offense here would conflict with the careful framework Congress adopted”). See also Hines, 312 U.S. at 67, 61 S.Ct. 399 (noting that expressions such as "conflicting” or "occupying the field” do not provide “an infalli *898 ble constitutional test or an exclusive constitutional yardstick”).

. See Erin F. Delaney, Note, In the Shadow of Article I: Applying a Dormant Commerce Clause Analysis to State Laws Regulating Aliens, 82 N.Y.U. L.Rev. 1821 (2007); Karl Manheim, State Immigration Laws and Federal Supremacy, 22 Hastings Const. L.Q. 939, 958 (1995) (referring to the "Dormant Immigration Clause”).

. See Compact of Free Association, reprinted at 48 U.S.C. § 1901 note. A citizen of the Marshall Islands or the Federated States of Micronesia may "establish residence as a nonimmigrant in the United States and its territories and possessions.” Compact § 141(a). The Compact further specifies:
The right of such persons to establish habitual residence in a territory or possession of the United States may, however, be subjected to nondiscriminatory limitations provided for:
(1) in statutes or regulations of the Unities States; or
(2) in those statutes or regulations of the territory or possession concerned which are authorized by the laws of the United States.
Compact § 141(b).

. Nothing I have said here should dimmish in any way the fact that aliens are "persons” entitled to the protection of the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Due Process Clause — including its equal protection component — of the Fifth Amendment. See Tak-ahashi, 334 U.S. at 410, 68 S.Ct. 1138; Truax, 239 U.S. at 33, 36 S.Ct. 7. But the tension evident in the Court's post-Graham cases is a consequence of the Court’s efforts to reconcile the Equal Protection Clause with a recognition that there are common law and constitutional distinctions between the rights of citizens and the rights of aliens visiting or residing in the United States.